MANCHESTER ENVIRONMENTAL COALITION ET AL. V.
EDWARD J. STOCKTON ET AL.

BOGDANSKI, SPEZIALE, PETERS, ARMENTANO and WRIGHT, JS.

52

Argued December 11, 1980—decision released May 5, 1981

*Anthony F. Pagano,* with whom were *David L. Schulman* and, on the brief, *Bruce S. Beck,* for the appellants-appellees (plaintiffs).

*Bourke G. Spellacy,* with whom was *Elizabeth R. Collins,* for the appellee-appellant (defendant J. C. Penney Company, Inc.)

*Bernard F. McGovern, Jr.,* assistant attorney general, with whom, on the brief, was *Carl R. Ajello,* attorney general, for the appellee-appellant (named defendant).

*Rolland J. Castleman,* with whom was *Jules A. Karp,* for the appellee-appellant (defendant Manchester Economic Development Commission).

BOGDANSKI, J. This is an appeal by the plaintiffs, Michael Dworkin and Edith Schoell,[1] from the decision of the trial court sustaining the action of the defendant, Edward J. Stockton, commissioner of commerce (commissioner), in approving the project plan for an industrial park to be located in Manchester.

In their cross appeal the defendants are challenging the court's finding of statutory standing for the plaintiffs. Although the legal issues are complex, the facts, while numerous, are largely undisputed.

In 1975 the state department of commerce initiated steps to develop an industrial park, which would include a catalogue distribution center for the J. C. Penney Company, Inc. In 1976, Manchester, along with other municipalities in the Hartford area, received an inquiry concerning a major commercial project that would require a site of approximately 200 acres with rail facilities and major highway access. The site eventually chosen consists of a 393 acre parcel in the northwest corner of Manchester.

The commerce department's involvement stems from chapter 132 of the General Statutes, entitled Municipal Development Projects. The purpose of this chapter is to encourage the growth of industry and business within the state.[2] Pursuant to this

---

[1] The trial court found that the Manchester Environmental Coalition was not a proper party plaintiff which finding has not been challenged.

[2] "[General Statutes] Sec. 8-186. DECLARATION OF POLICY. It is found and declared that the economic welfare of the state depends upon the continued growth of industry and business within the state; that the acquisition and improvement of unified land and water areas and vacated commercial plants to meet the needs of industry

chapter, the defendant town of Manchester, acting through the defendant Manchester Economic Development Commission (MEDC), retained the firm of Griswold and Fuss, Inc., to prepare the project plan. This project plan was submitted to the commissioner on January 10, 1977.

As required by General Statutes § 8-191, before the MEDC could adopt the plan, the Manchester planning commission had to find that it was in accord with the plan of development for the municipality. The capitol region council of governments had to do likewise for the region. The above required acts were performed in early 1977.

Section 8-189 (k) provided that "[t]he project plan shall include: . . . (k) findings . . . that the plan is not inimical to any statewide planning program objectives of the state or state agencies as coordinated by the department of planning and energy policy . . . ." In conformity with this mandate, the department of planning and energy policy contacted numerous state agencies and requested their comments. Five of the thirteen agencies contacted responded with noninimical findings. The department of agriculture and the environmental protection agency, however, indicated that the plan might be inimical. On March 10, 1977, the depart-

and business should be in accordance with local, regional and state planning objectives; that such acquisition and improvement often cannot be accomplished through the ordinary operations of private enterprise at competitive rates of progress and economies of cost; that permitting and assisting municipalities to acquire and improve unified land and water areas and to acquire and improve or demolish vacated commercial plants for industrial and business purposes in accordance with such planning objectives are public uses and purposes for which public moneys may be expended; and that the necessity in the public interest for the provisions of this chapter is hereby declared as a matter of legislative determination."

ment of planning and energy policy reported that the project would not be inimical to any statewide objectives. On March 11, 1977, the commissioner approved the project plan.

During November and December, 1976, the commissioner was requested by the plaintiffs to comply with General Statutes § 22a-1b (b) which requires an environmental impact statement. The commissioner agreed to comply with § 22a-1b (b). The impact statement was delivered to the commissioner in May, 1977. Thus, the project was approved before the impact statement was completed.

Under General Statutes § 8-195 the state approval of the project authorizes a state grant not exceeding 50 percent of the net cost. The financing was undertaken by the MEDC and a bond issue for this purpose was approved by Manchester voters on March 15, 1977.

On March 10, 1977, the plaintiffs brought suit seeking a declaratory judgment, and temporary and permanent injunctions against commissioner Stockton, the MEDC, and Gerald Okrant, chairman of the MEDC. The town of Manchester and the J. C. Penney Company, Inc., were later added as defendants.[3] On June 14, 1977, Public Acts 1977, No. 77-410 (validating act) was approved.

I

THE ENVIRONMENTAL PROTECTION ACT

The plaintiffs alleged a violation of the Environmental Protection Act of 1971 (EPA). General Statutes §§ 22a-14 through 22a-20. This act expands the class of plaintiffs who are empowered to institute

[3] Gerald Okrant was not named as a defendant in the substituted complaint of September 29, 1977.

proceedings to vindicate the public interest. The act creates both procedural and substantive rights. Similar acts have been passed in many states.[4] They are best known for eliminating standing barriers prevalent in traditional litigation.[5]

In their action, the plaintiffs sought to enjoin "unreasonable pollution, impairment or destruc-

[4] For a discussion of environmental protection acts in other states, and a summary of significant cases under those acts, see, e.g., Bryden, "Environmental Rights in Theory and Practice," 62 Minn. L. Rev. 163 (1978); Thibodeau, "Michigan's Environmental Protection Act of 1970: Panacea or Pandora's Box," 48 J. Urban L. 579 (1971); comment, "Highways, Environmental Legislation, and Judicial Review: The Changing Notion of Necessity," 50 N.D.L. Rev. 483 (1973); Haynes, "Michigan's Environmental Protection Act in its Sixth Year: Substantive Environmental Law from Citizen Suits," 53 J. Urban L. 589 (1976); note, "Environmental Law — A Balancing Test Adopted Under MERA," 5 Wm. Mitchell L. Rev. 270 (1979); Sax & Conner, "Michigan's Environmental Protection Act of 1970: A Progress Report," 70 Mich. L. Rev. 1004 (1972); Goldshore, "A Thumbnail Sketch of the Environmental Rights Act," 1975 N.J. St. Bar J. 18; comment, "The Florida Environmental Protection Act of 1971: The Citizen's Role in Environmental Management," 2 Florida St. U.L. Rev. 736 (1974); Cramton & Boyer, "Citizen Suits in the Environmental Field: Peril or Promise?" 2 Ecology L.Q. 407 (1972); Sax & DiMento, "Environmental Citizen Suits: Three Years' Experience Under the Michigan Environmental Protection Act," 4 Ecology L.Q. 1 (1974); comment, "Standing on the Side of the Environment: A Statutory Prescription for Citizen Participation," 1 Ecology L.Q. 561 (1971); McGregor, "Private Enforcement of Environmental Law: An Analysis of the Massachusetts Citizen Suit Statute," 1 Envtl. Aff. 606 (1971); McLennan, "State Legislation to Grant Standing: Questions, Answers and Alternatives," 2 Envtl. L. 313 (1972); Baker, "Eminent Domain and the Minnesota Environmental Rights Act: A Shift in the Balance of Power?" 9 Urban L. Ann. 237 (1975); Hatch, "Massachusetts and Michigan: Two States with an Answer," 6 Lincoln L. Rev. 119 (1971).

[5] See Kelly, "Belford v. New Haven—Erosion of the Private Plaintiff's Standing under the Environmental Protection Act," 50 Conn. B.J. 411 (1976); Johnson, "The Environmental Protection Act of 1971," 46 Conn. B.J. 422 (1972); 14 H. R. Proc., Pt. 2, 1971 Sess., p. 739.

tion"[6] of the air which would result from the automobile traffic generated by the expected employment at the industrial site of 2000 full-time and 600 part-time workers. It is clear, and the trial court so found, that the plaintiffs have standing under § 22a-16 which confers standing upon "any person" to sue "any person" for "the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction."[7] Statutes such as the EPA are remedial in nature and should be liberally construed to accomplish their purpose.

The trial court ruled that the plaintiffs' standing and their burden of proof at the trial comprise one and the same thing. That is not the case. Standing is automatically granted under the EPA to "any person." The plaintiffs need not prove any pollution, impairment or destruction of the environment in order to have standing.

It is appropriate at this point to discuss the burden of proof under the EPA. Although the ultimate burden of proof never shifts from the plaintiff, the EPA contemplates a shifting of the burden of production.[8] See *Ray* v. *Mason County Drain Commissioner*, 393 Mich. 294, 311, 224 N.W.2d 883 (1975). The plaintiff must first make "a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair, or

---

[6] General Statutes § 22a-16.

[7] To the extent *Belford* v. *New Haven*, 170 Conn. 46, 364 A.2d 194 (1975), holds otherwise, it is overruled.

[8] Our construction of the statute is fortified and confirmed by its legislative history. See Hearings before the Joint Standing Committee on the Environment, Pt. 1, 1971 Sess., p. 162.

destroy the public trust in the air, water or other natural resources of the state . . . ." General Statutes § 22a-17.[9]

Under § 22a-17, the plaintiff must first come forward and show that the defendant has, or is reasonably likely to unreasonably pollute, impair, or destroy a natural resource. The legislative history shows that the word "unreasonably" was added as a means of preventing lawsuits directed solely for harassment purposes.[10]

A review of the record shows that the plaintiffs presented a prima facie case by showing a protectible natural resource (air) and that the action of the defendants would impair this resource. See

[9] The trial court utilized five guidelines to test whether the plaintiffs proved unreasonable pollution: "(1) Overall state policy as expressed in the statutes and regulations. (2) Existence or nonexistence of state or federal standards concerning the activity in question. (3) Analysis and input by other governmental agencies concerning environmental considerations. (4) Reasonableness of efforts by the project's backers to alleviate adverse environmental consequences. (5) Alternatives." The trial judge did not indicate whether the plaintiff proved a prima facie case. A balancing of these factors is not the proper test by which to determine unreasonable pollution.

[10] Although not controlling on statutory interpretation, judicial notice may be taken of discussions in the General Assembly. *Tax Commissioner* v. *Estate of Bissell,* 173 Conn. 232, 245, 377 A.2d 305 (1977); *Miller* v. *Board of Education,* 166 Conn. 189, 194, 348 A.2d 584 (1974); *New Haven* v. *Public Utilities Commission,* 165 Conn. 687, 695, 345 A.2d 563 (1974); *Hartford Electric Light Co.* v. *Wethersfield,* 165 Conn. 211, 224, 332 A.2d 83 (1973).

The defendants argue that the word "unreasonable" was intended to permit the balancing of major state policies and competing interests. The clear legislative history shows that this was not the intent. In discussing the difference between S.B. 400 (which did not include the word "unreasonably") and H.B. 5037 (which was enacted into law), James Wade, attorney for the majority leadership of the House, stated: "Now in framing this legislation, it was our judgment that all of us pollute the environment to one degree or another, simply by breathing, obviously we introduce elements into the

*County of Freeborn* v. *Bryson,* 297 Minn. 218, 228, 210 N.W.2d 290 (1973), rev'd on other grounds, 309 Minn. 178, 243 N.W.2d 316 (1976). Joseph Laforte, acting director of planning and coordination of the department of environmental protection, stated in part, "[t]here would be an increase in auto emissions, assuming that the automobile is the primary mode of transportation to and from the park." Dr. Thomas Sharpless, an expert called by the plaintiff, testified that "[m]y opinion is that there would be a significant impact [on Manchester air quality] and the basis for that is that there will be an increase at the site in traffic. Also, I believe that there is reasonable certainty that a large portion of that traffic will be of trips that wouldn't have been ordinarily made and are not simply diverted trips. And that the increased emissions will result in increased oxidant formation." Since the plaintiffs showed that the project would add more pollution, they presented a prima facie case.

Section 22a-17 expressly provides that the conduct of the defendant may be considered acting alone, or in combination with others. This recognizes the fact that a person may be polluting the

environment which are not natural. And therefore, if we are going to permit the use of the courts by citizens to bring lawsuits against those who do pollute the environment, we believe there must be a check to prevent those suits which are brought simply for harassment, and for no other purpose. Therefore, H.B. 5037, which Speaker Ratchford has introduced, permits law suits against those who unreasonably pollute the environment . . . . if S.B. 400 were passed with no check, then you might wind up with spite suits between neighbors and that sort of thing over conditions that are nothing more than spite between neighbors. We feel our bill, which imposes the reasonable standard, would be such as to eliminate that possibility." Hearings before the Joint Standing Committee on the Environment, Pt. 1, 1971 Sess., p. 162.

The trial court found that the plaintiffs were not solely motivated by harassment purposes.

environment but that his pollution alone may not be unreasonable. But when his pollution is introduced into the environment in combination with others, it may become unreasonable.[11]

Once a prima facie case is shown, the burden of production shifts to the defendant. Under § 22a-17, "the defendant may rebut the prima facie showing by the submission of evidence to the contrary." As stated in *Ray* v. *Mason County Drain Commissioner,* supra, 311-12, "[t]he nature of the evidence necessary to rebut plaintiff's showing will vary with the type of environmental pollution, impairment or destruction alleged and with the nature and amount of the evidence proffered by the plaintiff. In some cases, no doubt, testimony by expert witnesses may be sufficient to rebut plaintiff's prima facie showing. While in other actions the defendant may find it necessary to bring forward field studies, actual tests, and analyses which support his contention that the environment has not or will not be polluted, impaired or destroyed by his conduct. Such proofs become necessary when the impact upon the environment resulting from the defendants' conduct cannot be ascertained with any degree of reasonable certainty absent empirical studies or tests." Because the trial court did not apply the statutory burden-shifting test, it did not decide whether the defendants sufficiently rebutted the plaintiffs' prima facie case. This issue must be determined on remand. We do not reverse the decision because of a disagreement with the trial court on a question of fact or the credibility of the witnesses. We require reversal because the court

---

[11] The trial court erred when it stated, in its memorandum of decision, that air pollution in Connecticut could not be considered in combination with air pollution caused by the defendants' project.

did not follow the statute. The five guidelines used by the trial court, footnote 9, have no basis in the statute. We cannot assume that the trial court applied the statutory burden-shifting test even though the memorandum of decision does not so state.

Furthermore, we cannot affirm the decision by holding that the same result would be reached even if the trial court had applied the proper statutory standard. It is not clear that the same result would be reached. The standard which the trial court used is at variance with the correct standard as stated in the EPA and the relevant case law.

In addition to rebutting the plaintiffs' prima facie case, the defendants may also prove, "by way of an affirmative defense, that, considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct and that such conduct is consistent with the reasonable requirements of the public health, safety and welfare." General Statutes § 22a-17.

The words "feasible and prudent alternative" have been construed in federal cases. In *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U.S. 402, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971), Tennessee citizens and local conservation organizations brought an action against the secretary of transportation, alleging that he had violated federal statutes in approving acquisition of parkland near Memphis for highway construction. Under 49 U.S.C. § 1653(f) (1964 Ed., Sup. V), the Department of Transportation Act of 1966, as amended, and 23 U.S.C. § 138 (1964 Ed., Sup. V), the Federal-Aid Highway Act of 1968, the secretary of transportation may not authorize use of federal

funds to finance construction of highways through public parks if a "feasible and prudent" alternative route exists. The court found the language to be "a plain and explicit bar to the use of federal funds for construction of highways through parks — only the most unusual situations are exempted." *Citizens of Preserve Overton Park, Inc.* v. *Volpe,* supra, 411. The language gave the secretary little discretion. "For this exemption to apply the Secretary must find that as a matter of sound engineering it would not be feasible to build the highway along any other route." Ibid. The requirement that there be no other "prudent" route does not permit one to engage in a wide-ranging balancing of competing interests. Considerations of cost should not be paramount.

"Feasibility" in the EPA has been construed so as to have the same meaning as "feasibility" was held to have in *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* supra. *People for Environmental Enlightenment and Responsibility (PEER), Inc.* v. *Minnesota Environmental Quality Council,* 266 N.W.2d 858 (Minn. 1978). See note, "Minnesota Environmental Policy Act — In re City of White Bear Lake," 4 Wm. Mitchell L. Rev. 238, 242 n.30 (1976). The trial court stated, in its discussion of alternatives, "[l]ikewise, the plaintiffs' argument that mass transit should be considered as an alternative component of the project plan is unrealistic and an attempt to have the commissioner take into consideration nonexistent factors. There is no Connecticut transportation plan in effect. There is no plan or funding for mass transit to the site. To require the commerce commissioner to consider impractical or nonexistent alternatives imposes shackles on his per-

formance and if followed through would bring economic development in Connecticut to a screeching halt." This is not the proper standard by which to measure "feasible and prudent" alternatives.[12]

"Prudent" alternatives are those which are economically reasonable in light of the social benefits derived from the activity. See *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* supra. Mass transportation may surely be a prudent alternative to reliance on the automobile for transportation to this site. The social benefits to be derived from mass transportation are obvious. Cost may be considered in deciding what is "prudent." A mere showing of expense, however, will not mean that an alternative is imprudent. To do so would eviscerate the EPA.

Moreover, the affirmative defense allowed by § 22a-17 must be specially pleaded. Practice Book § 164. The defendants here did not plead this affirmative defense but may do so on remand. On remand, if the defendants seek approval of this project without adequate provisions made for mass transportation, they must show that mass transportation is not "feasible or prudent."

### The Environmental Policy Act

The Environmental Policy Act, General Statutes § 22a-1a through § 22a-1h, is separate and distinct from the EPA. It was modeled after the National Environmental Policy Act of 1969 (NEPA). 42 U.S.C. §§ 4331 through 4335.[13] The

---

[12] The fact that there is no plan or funding for mass transit to the site is not a justification for the defendants' conduct; rather, this is the very problem which the plaintiffs seek to remedy.

[13] Remarks of Sen. Costello, Hearings before the Joint Standing Committee on the Environment, Pt. 3, 1973 Sess., p. 1031.

Environmental Policy Act was enacted in 1973 and amended in 1977 by Public Acts 1977, No. 77-514.[14] Section 22a-1b (b) provided that "[e]ach state department, institution or agency responsible for the primary recommendation or initiation of actions which may significantly affect the environment shall in the case of each such action make a written evaluation of: (1) the consequences of the proposed action to the environment, including primary and secondary impacts on ecological systems; (2) adverse environmental effects which cannot be avoided and irreversible and irretrievable commitments of resources should the proposal be implemented; (3) alternatives to the proposed action."

The initial question is whether the plaintiffs have standing to challenge the commissioner's preparation of, and the content of, the impact statement. The trial court held that the plaintiffs did not have standing, apart from the EPA, since they did not prove unreasonable pollution. Again, the trial court ruled that the plaintiffs' standing and their burden of proof were one and the same. A party, however, need not prove the merits of his case merely to have standing.[15] Standing is an examination of the parties, not the merits of the action. *Maloney* v. *Pac*, 183 Conn. 313, 319–21, 439 A.2d 349 (1981). Comment, "Standing to Sue in the Federal Courts:

---

[14] The amendments were effective October 1, 1977, which was after the project plan was approved. General Statutes § 2-32. The amendments are, therefore, not applicable. *Murphy, Inc.* v. *Board of Zoning Appeals*, 147 Conn. 358, 361, 161 A.2d 185 (1960).

[15] Although the concept of standing is similar to the Connecticut law of aggrievement, the two are not identical. For a discussion of the law of aggrievement, see *Hall* v. *Planning Commission*, 181 Conn. 442, 435 A.2d 975 (1980). The Environmental Policy Act does not require aggrievement as a prerequisite to challenging the preparation, or lack of preparation, of an impact statement.

Congressional Power to Reduce Judicial Barriers to Justiciability," 2 W. New Eng. L. Rev. 71 (1979). Standing is not a matter of constitutional law in Connecticut, but is rather a rule of judicial administration based upon the principle that the appropriate parties to litigate a dispute are those who are injured or about to be injured. The purpose of this requirement is generally said to ensure the existence of that concrete adverseness between the parties that guarantees "that the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation would be pursued with the necessary vigor . . . ." *Flast* v. *Cohen,* 392 U.S. 83, 106, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968).[16]

As already noted, the trial court found that the plaintiffs had standing to challenge the preparation of the impact statement under the EPA. We agree.[17] The relationship of the EPA to the Environmental Policy Act is a matter of first impression.[18] Section 22a-1a (a) provides that the Environmental Policy Act is "[i]n furtherance of and pursuant to sections 22a-1 and *22a-15* . . . ." (Emphasis added.) This

---

[16] Commentators have criticized the injury requirement, contending that it does not ensure specific framing of issues, or the necessary adverseness. Note, "Direct Injury and Standing," 2 W. New Eng. L. Rev. 793 (1980).

[17] For a discussion of the relationship between EPAs and other statutes, see Sax & Conner, "Michigan's Environmental Protection Act of 1970: A Progress Report," 70 Mich. L. Rev. 1004, 1060 (1972).

[18] One commentator noted that courts are moving toward wider standing for groups and individuals bringing environmental suits. Oakes, "Environmental Litigation: Current Developments and Suggestions For The Future," 5 Conn. L. Rev. 531 (1973).

Since we hold that the plaintiffs have statutory standing to challenge the preparation of the impact statement, we do not discuss the relationship of nonstatutory standing to the Environmental Policy Act.

language indicates that the Environmental Policy Act was intended to be supplemental to the EPA. The standing conferred by the EPA is for the limited purpose of raising environmental issues. *Mystic Marinelife Aquarium, Inc.* v. *Gill,* 175 Conn. 483, 490, 400 A.2d 726 (1978). An allegation of failure to comply with the Environmental Policy Act is clearly an environmental issue.

Moreover, we find the rationale of *Boston* v. *Massachusetts Port Authority,* 364 Mass. 639, 308 N.E.2d 488 (1974), persuasive. The court there held that the plaintiff had standing under Mass. General Laws Ann., c. 214 § 10A, now c. 214 § 7A, the Massachusetts Environmental Protection Act, to raise procedural questions under the Massachusetts Environmental Policy Act, c. 30 § 61 and refused to apply a narrow, technical interpretation of the statute.[19]

The trial court ruled that the commissioner was not required to prepare an impact statement. Although we find that the validating act cured any deficiencies in compliance with the Environmental Policy Act, we discuss the ruling because of the importance of the issues involved.

Section 22a-1b (b) provided that "[e]ach state department, institution or agency responsible for the primary recommendation or initiation of actions which *may* significantly affect the environment shall in the case of each such action make a written evaluation . . . ." (Emphasis added.) The trial court ruled that "before Sec. 22a-1b is triggered the

---

[19] The opinion discussed the distinction between standing and jurisdiction under the Massachusetts act. See comment, "The Florida Environmental Protection Act of 1971: The Citizen's Role in Environmental Management," 2 Florida St. U.L. Rev. 736, 748 (1974).

actions initiated *must* 'significantly affect the environment.' " (Emphasis added.) In using the word "may" rather than "must" the legislature expressed an intent that an impact statement be prepared whenever there is a reasonable possibility that a state action might have a detrimental effect on the environment.

The Environmental Policy Act threshold for requiring an impact statement is lower than its federal counterpart, NEPA. 42 U.S.C. § 4332(2) (c). NEPA requires an impact statement for "major Federal actions significantly affecting the quality of the human environment." Jurisdictions which have construed this provision, and comparable state provisions have adopted a minimal threshold standard. E.g., *Students Challenging Regulatory Agency Procedures* v. *United States,* 346 F. Sup. 189, 201 (D.C. Cir. 1972), rev'd on other grounds, 412 U.S. 669, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973); *No Oil, Inc.* v. *Los Angeles,* 13 Cal. 3d 68, 85, 529 P.2d 66 (1974); *Secretary of Environmental Affairs* v. *Massachusetts Port Authority,* 366 Mass. 755, 769, 323 N.E.2d 329 (1975). In conformity with the policy expressed by § 22a-1a we conclude that an impact statement is required whenever the project will arguably damage the environment. The addition of the large number of motor vehicles in this project area is sufficient to show that the project will arguably damage the environment.[20]

---

[20] An agency's determination that no impact statement is necessary is subject to judicial review. Federal courts, under NEPA, have generally exercised de novo review of an agency's determination that no impact statement is necessary. Comment, "Judicial Review of a NEPA Negative Statement," 53 B.U.L. Rev. 879, 890 (1973) (prevailing tendency of federal courts is de novo review). See *Scherr* v. *Volpe,* 336 F. Sup. 886, 888 (W.D. Wis. 1971), aff'd, 466

As a guide to future conduct, agencies must recognize that the purpose of the Environmental Policy Act is to ensure the thoughtful and meaningful consideration of environmental factors. This purpose fails when, as here, the impact statement was submitted to the commissioner after he had approved the project. Moreover, the impact statement failed to consider air quality. As trustee of the environment, the state has a responsibility to see that this factor is considered.

Lastly, the treatment of alternatives is deficient. The statement saw two potential alternatives: build I-291 in place of the industrial park, or leave the land to its present private uses. This is a narrow view of possible alternatives which should be considered by the trial court. The plaintiffs are suing because of the air pollution which will be generated by increased automobile traffic. A proper

F.2d 1027 (7th Cir. 1972) (de novo standard); *Wyoming Outdoor Coordinating Council* v. *Butz*, 484 F.2d 1244, 1249 (10th Cir. 1973) (reasonableness standard); *Hanly* v. *Kleindienst*, 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S. Ct. 2290, 36 L. Ed. 2d 974 (1973) (arbitrary, capricious, abuse of discretion standard). We find this standard of review in accord with § 22a-1b (b). Our statute is not cast in terms of administrative discretion, but speaks in mandatory terms. The determination of whether an action "may significantly affect the environment" is a legal issue, involving the interpretation of § 22a-1b and § 22a-1c, which can be decided by a court.

The trial court ruled that, even though an impact statement was not required, the statement that was prepared did not comply with § 22a-1b. We agree that the statement was insufficient. We find the standard of review enunciated by *Calvert Cliffs' Coordinating Committee* v. *U. S. Atomic Energy Commission*, 449 F.2d 1109, 1115 (D.C. Cir. 1971), and *I-291 Why? Assn.* v. *Burns*, 372 F. Sup. 223, 241 (D. Conn. 1974), aff'd, 517 F.2d 1077 (2d Cir. 1975), persuasive. Under these cases, the Environmental Policy Act contemplates the use of two standards of review: a strict standard for reviewing compliance with the act's procedural requirements and a lenient standard for reviewing the act's substantive duties.

impact statement in this case would consider the alternative of reliance on mass transportation in place of the private automobile. It is not merely a choice between building the project and not building it. The Environmental Policy Act does not have as its purpose the stoppage of all future industrial growth, but rather compels consideration of ways in which environmental damage can be minimized.

## VALIDATING ACT

The validating act, now General Statutes § 8-191a, provides: "EFFECT OF COMMISSIONER'S FAILURE TO MAKE ENVIRONMENTAL EVALUATION. No plan prepared and approved under sections 8-189 and 8-191, *which includes the findings enumerated in subsection (k) of section 8-189,* shall be invalid and deemed ineffective solely because of the commissioner's failure to comply with any provision of sections 22a-1a to 22a-1f, inclusive. All actions taken by the commissioner between February 1, 1975, and June 14, 1977, are validated. Nothing in this section or section 8-191, 8-193 or 8-196 shall relieve the commissioner from his obligation to comply with sections 22a-1a to 22a-1f, inclusive, subsequent to June 14, 1977." (Emphasis added.)

Section 8-189 provided, in pertinent part: "[t]he project plan shall include: . . . (k) findings . . . that the plan is not inimical to any statewide planning program objectives of the state or state agencies as coordinated by the department of planning and energy policy . . . ."

We agree with the plaintiffs' contention that inclusion of the § 8-189 (k) findings in the project plan is a condition for validation of the project plan. The plaintiffs further contend that the

defendants MEDC and the commissioner acted unlawfully with respect to the § 8-189 (k) non-inimical findings, arguing that the statute requires an affirmative finding of non-inimicalness by all of the reviewing agencies.

The intent of the legislature, as expressed in § 8-189 is to ensure that municipal development projects are in accord with statewide planning objectives. A mere recitation of statutory language, however, without any factual basis cannot comport with this legislative intent. In determining whether the § 8-189 (k) findings satisfy the statute, we note that the statute does not explicitly direct the department of planning and energy policy to proceed in any particular manner. This lack of precision in the statute gives the department some discretion in carrying out its duty.

The planning commissioner has the responsibility of coordinating these findings. "Coordinate" is defined in Webster, Third New International Dictionary as "to bring into a common action, movement, or condition: regulate and combine in harmonious action." That is what was done here by the commissioner of planning and energy policy. He solicited, received and reviewed agency responses to the project. His finding was made part of the project plan. There is no requirement in the statute that the project plan include non-inimical findings from each state agency solicited. We have examined the responses of the departments of agriculture and environmental protection and find that the planning commissioner was within his discretion in giving an affirmative § 8-189 (k) finding.

The plaintiffs contend that the validating act is unconstitutional because it denies the plaintiffs' rights to due process of law and equal protection of the law, and constitutes an encroachment upon the judicial branch by the legislative branch of government.

The applicable law regarding validating acts is expressed in *C.S.E.A., Inc.* v. *Connecticut Personnel Policy Board,* 165 Conn. 448, 334 A.2d 909 (1973). "The effect of validating acts is to make legal and regular that which was illegal and irregular. The legislature may cure by subsequent enactment the nonobservance of a requirement which it originally might have dispensed with, provided that vested rights have not intervened . . . . Such an enactment may be applied retrospectively to pending cases." *C.S.E.A., Inc.* v. *Connecticut Personnel Policy Board,* supra, 454–55.

The plaintiffs claim that the validating act attempts to retrospectively destroy a right which the plaintiffs relied upon, that right being their right to enforce the provisions of § 22a-16. They further claim that their rights to sue, and to enjoy clean air, became vested on the day suit was instituted. To be vested, a right "must have become a title, legal or equitable, to the present or future enjoyment of property, or to the present or future . . . enforcement of a demand, or a legal exemption from a demand made by another." *Hagerty* v. *Administrator,* 137 Conn. 129, 133, 75 A.2d 406 (1950), quoting from 2 Cooley, Constitutional Limitations (8th Ed.) p. 749. Clearly, the right to sue for procedural defects in the preparation of an impact statement is not such a vested right. The plaintiffs do not allege that the commissioner lacked

authority, but rather that he attempted to exercise his authority in an unauthorized fashion. "The law is well established in this state that invalidity which comes about in this manner may be cured retrospectively by appropriate legislation." *Moran* v. *Bens*, 144 Conn. 27, 31, 127 A.2d 42 (1956).

In contending that the validating act amounts to an unconstitutional encroachment by the legislature upon the authority of the judiciary, the plaintiffs rely on the proposition stated by this court in *Preveslin* v. *Derby & Ansonia Developing Co.*, 112 Conn. 129, 151 A. 518 (1930), that "[w]hatever power the legislature may have as to future procedure it cannot change the procedure affecting past transactions in such way as to prevent judicial control of that situation." *Preveslin* v. *Derby & Ansonia Developing Co.*, supra, 144.

The plaintiffs' reliance on this proposition is misplaced. The statute in *Preveslin* created a presumption that the presentation of bills to the governor had been made in accordance with the state constitution. The jurisdiction to determine whether a statute is in conflict with the state constitution is in the judiciary. The present validating act contains no such presumption. It merely corrects noncompliance with the provisions of §§ 22a-1 through 22a-1f.

There is error in part, the judgment is affirmed except as to the issues raised pursuant to the Environmental Protection Act, and as to those issues only, a new trial is ordered.

In this opinion PETERS and ARMENTANO, Js., concurred.

SPEZIALE, J. (dissenting). The majority of the court, by its action today, has usurped the fact-finding function of the trial court.

Whether the defendants' conduct is "reasonably likely unreasonably to pollute" the environment is a question of fact. General Statutes § 22a-17; *Mystic Marinelife Aquarium, Inc.* v. *Gill*, 175 Conn. 483, 503, 400 A.2d 726 (1978). With respect to the plaintiffs' prima facie showing of unreasonable pollution and the defendants' rebuttal evidence, the principles regarding burden of proof and weight of the evidence are the same in an action brought under the Environmental Protection Act of 1971 as in other civil actions. General Statutes § 22a-17. During the lengthy trial, the trial court heard extensive testimony from experts for both sides, examined a great number of exhibits, and viewed the premises. In its memorandum of decision the trial court summarized the plaintiffs' evidence and concluded that, even before applying the five guidelines criticized by the majority opinion, the plaintiffs had failed to prove unreasonable pollution.[1] Although the trial court did not use the magic words "prima facie case" or "sufficiently rebutted," they are implicit in the findings and conclusions stated in the memorandum of decision. *State* v. *Hawthorne*, 176 Conn. 367, 371, 407 A.2d 1001 (1978).

---

[1] The court stated: "In general the plaintiffs' experts, honest and qualified as they were, presented a theoretical viewpoint not firmly based on available facts. . . .

"The court finds that the plaintiffs have failed to prove unreasonable pollution, impairment, or destruction of the public trust in the air, water, or other natural resources of the state. Further, even if plaintiffs' expert evidence were accepted in full at its face value the court finds no unreasonable pollution in the light of the five criteria set forth above."

It is the function of the trial court to weigh the evidence and judge the credibility of the witnesses. *Leabo* v. *Leninski,* 182 Conn. 611, 616, 438 A.2d 1153 (1981); *Toffolon* v. *Avon,* 173 Conn. 525, 530, 378 A.2d 580 (1977); *Johnson* v. *Flammia,* 169 Conn. 491, 497, 363 A.2d 1048 (1975). This court cannot find facts. Our role is to decide whether the decision of the trial court is "clearly erroneous in view of the evidence and pleadings in the whole record"; Practice Book § 3060D; *Stelco Industries, Inc.* v. *Cohen,* 182 Conn. 561, 564, 438 A.2d 759 (1980); and "where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence . . . ." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221, 435 A.2d 24 (1980). The majority does not state that the reason for disturbing the factual findings of the trial court is that those facts are "clearly erroneous." Why not? Perhaps it is because there is nothing in the record of this case to support such a conclusion.

Without justification the majority has taken over the fact-finding role of the trial court. Unfortunately, the parties and the judicial system will be subjected unnecessarily to the burdens of a new trial.

WRIGHT, J. (dissenting). I also dissent.