[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a three count complaint brought by James and Joan Pestey, who are neighbors to the defendants' dairy farm located on Route (Rte) 87 in North Franklin, Connecticut. The first count constitutes a claim of private nuisance against the defendants. In essence, it alleges that the manner in which the defendants manage their dairy operation causes the emission of noxious and offensive odors resulting in the plaintiffs' loss of the use and enjoyment of their home, and in non economic damages. While the defendants denied the essential allegations of the complaint, they also claimed, by way of special defense, entitlement to protection from nuisance claims pursuant to the provisions of General Statutes § 19a-341, commonly known as the "Right to Farm" statute.
The third count consists of a claim that the emission of noxious and offensive odors from the defendants' farm was the result of their wilful, reckless and wanton misconduct.
The second count, brought pursuant to General Statutes §22a-16, consists of a claim that the generation of noxious and offensive odors by the defendants have caused unreasonable pollution, impairment, or destruction of the air and water of the State of Connecticut.
The plaintiffs sought compensatory and punitive damages pursuant to the claims set forth in the first and third counts; CT Page 1177 with respect to the second count, the plaintiffs sought declaratory relief, an injunction, and the payment of costs and fees.
The legal and equitable issues were tried jointly and separately before the jury and the court. Since no party moved and the court did not order, pursuant to Practice Book §16-10, that the legal and equitable issues be tried to the jury, the court retained its fact-finding and decision-making responsibilities with respect to claims set forth in the second count. Procedurally, counsel and the court agreed that if any witness had testimony bearing exclusively on the equitable issues, that witness, or that portion of the witness' testimony, would be heard by the court in the absence of the jury. During voir dire, closing argument, and charge, the jury was informed that while the plaintiffs were seeking injunctive relief, it would be the court's responsibility to deal with that issue separately, and they should limit their deliberations regarding damages only to the plaintiffs' monetary claims.
At the close of the evidence, the court determined that the plaintiffs had failed to present sufficient evidence that the manner of the defendants' operation of their farm constituted wilful, wanton or reckless conduct and, therefore, did not submit the claims set forth in the third count to the jury.[1]
The jury found in favor of the plaintiffs on the first count. In response to interrogatories, the jury found that the emission of noxious and offensive odors from the defendants' farm constituted a permanent nuisance and awarded the plaintiffs sixty thousand ($60,000) dollars for the permanent loss of the enjoyment of their home and forty thousand ($40,000) dollars in non economic damages.
Following the jury verdict, the court visited the farm and adjacent area, including the portion of the plaintiffs' property which abuts Rte 87. The court was accompanied by the parties, counsel, and a court reporter.[2] After the site visit, the court conducted a hearing at which it heard further testimony and argument from counsel. Subsequently, both counsel submitted post-trial memoranda concerning the equitable issues.
By way of background, Rte 87 is a state highway which runs generally in a north and south direction between the towns of Lebanon and Norwich. James and Joan Pestey purchased their CT Page 1178 residence on the west side of Rte 87 in 1976. It is a nineteenth century colonial on a one and a half acre lot. The Pesteys also own adjacent land, totaling approximately sixty-one acres. Mr. and Mrs. Pestey have four adult children, William, Michael, James Jr., and Steven. Steven and William still live at home. Michael and James each moved from the home approximately four years ago, but each periodically return for visits. Both Pesteys are employed outside the home. Mr. Pestey is a self-employed truck salesperson; Mrs. Pestey is a school secretary.
Across Rte 87 and to the north, the Cushmans own several acres of land on which they conduct farming operations. When the Pesteys bought their property in 1975, the Cushmans leased the subject acreage from its (then) owner and utilized it to plant corn and hay, occasionally fertilizing it with manure. At the time, their dairy herd was maintained at a facility known as the "home farm" located on Kahn Road in North Franklin. In 1990, after the Cushmans purchased the Rte 87 acreage, they erected a forty-two thousand square foot free-stall barn and milking parlor for their dairy herd on the Rte 87 property. Adjacent to the barn, the defendants dug a manure storage pit. The barn and pit are set back from Rte 87, and along Rte 87 they are approximately one-third mile distant from the plaintiffs' residence. The barn and pit are at a higher elevation than the plaintiff's residence. From the barn and pit, the land slopes gradually down in a southerly direction and more steeply down in an easterly direction. It is fairly level to the north and west.
Mr. Pestey testified that he first noticed a strong manure odor in early 1991 when the wind was blowing from the north. He claimed that he smelled this odor approximately forty (40%) percent of the time he was home, particularly in the evening and very early morning hours. He stated that the odor intensified over time and within just a few months it changed in character to become more like sulphur, an odor he characterized as like a sewage treatment plant. Mr. Pestey stated that during 1991 and 1992 he complained about these odors to the North Franklin First Selectman and to the State Commissioner of Agriculture, to no avail. Thereafter, by complaint dated March 29, 1994, the plaintiffs commenced this action.
Subsequently, in 1997, the defendants installed a manure digester. Later, the plaintiffs amended their complaint to make separate claims regarding the digester. The digester includes a storage tank into which manure is pumped from the barn. Once in CT Page 1179 the tank, the manure is heated to cause metabolic changes to its components. In this process, the solid and liquid parts of the manure are separated, with the liquid part discharged into the sediment pond and the solid part collected and later sold as soil nutrient. As a byproduct of the digestion process, gas is created, which is utilized to generate electricity. Although the use of digesters in the United States is not prevalent, they are apparently common in Europe and Asia. Though the stated intention of the digester is to render the solid wastes benign, the liquid byproduct less odoriferous, and conserve utilities by generating electricity, there was substantial dispute during the trial concerning whether this particular digester was properly designed to handle the volume of manure which is processed through it. In the last few days of this lengthy trial, it became apparent that the digester had been taken off-line a few days earlier because its internal insulation was becoming detached, and waste product was visibly seeping from the digester tank.
Having prevailed on their claim that the odors emanating from the defendants' dairy operation constitute a permanent nuisance, the plaintiffs now, through the aegis of General Statutes §22a-16 seek injunctive relief, fees, and costs.
As a threshold matter, the defendants claim that the plaintiffs lack standing. The court disagrees. While the plaintiffs prosecuted the first and third counts to vindicate their private rights, they bring the second count as members of the public, entitled to bring such an action on behalf of the public to protect water and air quality. As such, they stand in a representative capacity.
General Statutes § 22a-16 states, in part, "any person . . . may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business . . . for declaratory and equitable relief against . . . any person, partnership . . . or other legal entity . . . for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction. . . ." Nowhere in this act is there a proscription against suits brought by citizens in their representative capacity who have also sought redress for a violation of their private rights. In Manchester EnvironmentalCoalition v. Stockton, 184 Conn. 51 (1981), the Supreme Court opined that the standing requirement of General Statutes §22a-16 should be liberally construed. Speaking for the court, CT Page 1180 Justice Bogdanski stated, "[i]t is clear, and the trial court so found, that the plaintiffs have standing under § 22a-16 which confers standing upon `any person' to sue `any person' for `the protection of the public trust in the air, water, and other natural resources of the state from unreasonable pollution, impairment or destruction.' Statutes such as the EPA are remedial in nature and should be liberally construed to accomplish their purpose." Id., 57. Therefore, the plaintiffs have standing.
The defendants also claim that since the plaintiffs sought monetary damages for the permanent loss of the use and enjoyment of their residence, they have made an election of remedy and should, therefore, be barred from asserting a claim for equitable relief. The court disagrees. Since the plaintiffs brought the second count in their representative capacity, their claim for monetary damages for private nuisance in the first count does not constitute an election of remedies. The purpose of General Statutes § 22a-16 is not to create a vehicle for the vindication of private rights, but rather to enlist the assistance of citizens to protect the public trust in the air, water, and other natural resources of the state. In bringing the second count, the plaintiffs' status is representative. They purport to speak for all citizens in their claim that the defendants have unreasonably polluted the air and water. Nowhere does the legislation suggest that litigants who may incidently benefit from the granting of equitable relief are not entitled to seek such relief against pollution on behalf of the citizenry.
Procedurally, General Statutes § 22a-16 and 22a-17 provide that plaintiffs who bring suit in this representative capacity must make a prima facie showing that the defendants' conduct "is reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state, . . . [then] the defendant may rebut the prima facie showing by the submission of evidence to the contrary." General Statutes § 22a-17. Prima facie evidence refers to evidence, which, if uncontradicted, is sufficient to submit the issues to a jury. Ballentine's Law Dictionary, 3rd Ed., p. 987. A plaintiff who establishes a prima facie case has met his burden of production, but not necessarily his burden of persuasion. His evidence is adequate for submission to the jury, but does not compel a verdict in his favor. Thus, where a plaintiff has met his burden of production, a defendant need not produce evidence, though he remains mute at his own risk. Cf. Tait and LaPlante,Handbook of Connecticut Evidence, 2nd ed, § 4.1.2. In this CT Page 1181 case, the plaintiffs have met their burden of production; they have not met their burden of persuasion.
The plaintiffs have offered evidence of the presence of noxious odors at their residence, the emission of odors from the defendants' dairy operation, and geographical and meteorological information relating to the slope of the surrounding land and the impact of certain weather patterns on the movement of air. The plaintiffs have satisfied their burden of production. Just as the jury was entitled to infer from this circumstantial evidence that odors emanated from the defendants' dairy operation and invaded the plaintiffs' property, the court could infer that odors are emitted from the defendants' operation and that such emanations unreasonably pollute, impair or destroy the public trust in the air of the state. Nevertheless, such a conclusion is not compelled by the evidence.
In order to recover under the second count, the plaintiffs must prove that the conduct of the defendants "is reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state." General Statutes § 22a-17. The phrase, "unreasonably to pollute" has been the subject of judicial scrutiny. In Manchester, the Supreme Court rejected the notion that reasonableness requires a balancing test among competing societal values, finding instead that the legislative purpose of that term was to prevent suits brought for harassment purposes only. Manchester v. EnvironmentalCoalition v. Stockton, supra, 184 Conn. 58-59. However, in determining whether such a suit was brought for harassment purposes only, the court looked not to the motivations of the plaintiffs, but at the question of whether the plaintiffs had, in fact, established a prima facie case of unreasonable pollution. The court stated, "[a] review of the record shows that the plaintiffs presented a prima facie case by showing a protectible natural resource (air) and that the action of the defendants would impair this resource." Id., 58.
Similarly, in Mystic Marinelife Aquarium, Inc. v. Gill,175 Conn. 483 (1978), the Court affirmed a trial court decision concerning potential harm to the Mystic River. The trial court had affirmed a decision of the Commissioner of Environmental Protection permitting a construction project on the river even though it was likely to cause some destruction of the river. The Supreme Court noted, "[a]lthough the trial court said that there was evidence that a portion of the Mystic River estuary would be CT Page 1182 destroyed, it stated that it is not clear from the record that the environmental impact of such destruction would be such as to render it unreasonable. The question of what is reasonable is one of fact. . . ." (Citations omitted.) Id., 503. While the court, inMystic Marinelife Acquarium was dealing with General Statutes § 22a-19 and not General Statutes § 22a-16, both statutes contain similar language. General Statutes § 22a-19, dealing with administrative proceedings, permits anybody or entity to intervene as a party in any such proceeding involving conduct "which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or natural resources of the state." General Statutes §22a-16 permits direct suit by any person or entity for the protection of the public trust in the air, water and other natural resources of the state "from unreasonable pollution, impairment or destruction . . ." Both statutes were passed in 1971 as part of the Environmental Protection Act. It would be absurd to conclude that the term "unreasonable" in General Statutes § 22a-16 refers only to the motivation of would-be plaintiffs, while the same term in General Statutes § 22a-19
refers to the reasonableness of the activity which is the subject of the administrative hearing. Thus, the Supreme Court's approval in Mystic Marinelife Acquarium of the hearing officer's analysis of the reasonableness of the destruction of an estuary of the Mystic River is pertinent to the court's consideration of whether the plaintiffs, in the instant action, have established a prima facie showing that the defendant Cushman's alleged pollution of the air and/or water is unreasonable. Since the intent of the Environmental Protection Act was to give standing to any person to bring suit on behalf of the public, the use of the term reasonableness standard is, itself, a safeguard against frivolous suits brought for harassment purposes. Thus, while this legislation might give one standing to claim that breathing pollutes the air and swimming pollutes the water, such claims, without more, would be unlikely to survive the reasonableness test and would, therefore, likely fail to constitute a prima facie case.
In order to establish a prima facie case, the plaintiffs must satisfy two prongs. They must show (1) the involvement of a protectible natural resource, and (2) pollution, impairment or destruction of that resource. Cf. Manchester EnvironmentalCoalition v. Stockton, supra, 184 Conn. 51. Viewing its analogous statute, the Minnesota Supreme Court interpreted the second prong as any conduct which has or is likely to have a materially CT Page 1183 adverse effect on the environment. Cf. County of Freeborn v.Bryson, 297 Minn. 218, 228, 210 N.W.2d 290 (1973). Once the plaintiffs satisfy their burden of production, the defendant may then rebut the plaintiffs' claims by contrary evidence. With respect to the type of evidence the defendant may offer, inManchester, the court cited the following language by the Michigan Supreme Court interpreting its analogous statute: "[t]he nature of the evidence necessary to rebut the plaintiff's showing will vary with the type of environmental pollution, impairment or destruction alleged and with the nature and amount of the evidence proffered by the plaintiff. In some cases, no doubt, testimony by expert witnesses may be sufficient to rebut plaintiff's prima facie showing. While in other actions the defendant may find it necessary to bring forward field studies, actual tests, and analyses which support his contention that the environment has not or will not be polluted, impaired or destroyed by his conduct. Such proofs become necessary when the impact on the environment resulting from the defendants' conduct cannot be ascertained with any degree of reasonable certainty absent empirical studies or tests." Manchester EnvironmentalCoalition v. Stockton, supra, 184 Conn. 60.
The plaintiffs claim that Mr. Pestey's log of odor intensity over a period of time demonstrates that the defendants' pollution of the air is persistent. To measure odor intensity Mr. Pestey was trained by an odor expert, Richard Duffee, in the use of six different bottles, each containing a different quantity of butanol. Mr. Duffee testified that after he assessed Mr. Pestey's olfactory competence, he trained him in the use of the butanol kit to identify odor intensity on a scale of one to six. Thereafter, Mr. Pestey kept a butanol kit at his home and recorded odor intensities in a log. According to Mr. Duffee, after just a few hours of training, a person is able to use this butanol kit to "rate" odor intensity on a scale of one to six. Mr. Pestey testified that having been qualified by Mr. Duffee as competent to use this kit, he then made recordings for several months of odor intensity at his residence. Although he only used the kit directly for the first several weeks because of the limited shelf-life of butanol, he was able to continue to log odor intensity based on his recollections of the six levels of odor intensity. Findings of odor intensity utilizing this butanol kit are subjective and dependent of the consistency of one's olfactory sensitivity as well as the accuracy and truthfulness of the reporter. The court finds the butanol-related testimony to be not probative. Mr. Pestey's use of this procedure was CT Page 1184 unscientific, and his report is unreliable.
The court further finds that Mr. Pestey was not a reliable witness. During his direct testimony, Mr. Pestey claimed that the "stench" from the defendants' farm became so great that his family no longer routinely gathered at their home. He further claimed that he was once planning to divide the Rte 87 acreage to give each of his sons a building lot, but they were no longer interested because of the odors emanating from the defendants' dairy farm. Finally, he denied that he had offered any money to an individual to collect signatures in a petition against the defendants. The inaccuracy of all this testimony was proven by the defendants. Through other witnesses and cross examination, the defendants proved that Mr. Pestey had, in fact, attempted to sell the development rights to his acreage to the State Department of Agriculture. Though Michael Pestey testified that he and his wife had considered building a home on the Rte 87 property, he claimed that he and his wife had decided against it because their desired location was" high" odor. Later proof in the case that Michael Pestey's marriage had, in fact, been dissolved in October, 1999 revealed this testimony to be disingenuous. Similarly, when confronted with the proof of Michael's marital dissolution, Mr. Pestey first claimed that he was unaware of it and later stated that he had given Michael the funds to retain a lawyer for his divorce. He claimed that since Michael had returned the funds, he thought that Michael and his wife had not proceeded to dissolve their marriage. In regard to the petition, the court finds credible the testimony of Lincoln Breault who stated that Mr. Pestey offered him one dollar for every signature he could obtain.[3] The court finds that Mr. Pestey was not a credible witness; his evidence was unreliable.
Mr. Duffee spent a total of fifteen minutes at the plaintiffs' residence and did not visit the defendants' farm. Of the two times he was present at the plaintiffs' residence, he detected an odor once. On one occasion he traveled to the plaintiffs' home after Mr. Pestey called him to report the presence of a noxious odor. Upon arrival, Mr. Duffee detected no odor. On another occasion, he did detect an odor at the Pestey residence. He described this odor as like burnt manure, and he stated that it was not continuous; it came in puffs. He utilized a device known as a scentometer to measure the concentration of odor in the atmosphere at the Pestey's home. Though Mr. Duffee did not go to the defendants' farm, he determined that the odor emanated from the farm by reason of the wind direction and the absence of odor CT Page 1185 upwind of the farm.
Since Mr. Duffee described the odor as coming in puffs and not consistently, the detection of no odor by Mr. Duffee upwind of the defendants' farm does not suggest its simultaneous presence down wind. Nor does the presence of the odor downwind of the farm suggest its simultaneous absence unwind. While his findings may permit an inference, it is not one in which the court will engage. It is curious that Mr. Duffee never availed himself the opportunity to investigate the character or intensity of odor at the defendants' farm. The court notes that Practice Book §13-9 appears to permit the plaintiffs access to the defendants' property for the purpose of conducting odor testing at the site. The failure of Mr. Duffee to attempt to assess the presence of odors at the defendants' farm is consistent with his testimony that his charge in this matter was to detect the presence of odor at the plaintiffs' residence only, and without regard to its source.
The plaintiffs also employed Lawson Safley, Ph.D., who is an agricultural engineer. Dr. Safley testified that he made a site visit to the defendants' farm during which he identified a number of potential odor sources. Based on his estimate of the number of cows, their average daily manure output, and the size and configuration of the manure digester, he hypothesized that partially digested fecal matter from the digester is a likely source of odor. Based on his belief that the digester does not retain manure for a sufficiently long period of time, Dr. Safley also hypothesized that the manure storage pond is a likely source of odor. Dr. Safley's testimony concerning his actual detection of odors on the defendants' farm was mixed. While he initially stated that he detected no noxious or offensive odors, he later stated that an odor nearby the silage area was borderline noxious. However, nowhere in the notes he took during his inspection did he record any observation of noxious or offensive odors. Interestingly, Dr. Safley testified that at one point he suggested that a survey of neighbors would be helpful in determining the extent of any odors in the area. Other than Mr. Pestey's furtive attempt to pay Mr. Breault for each signature he could obtain, no such survey was undertaken.
Anecdotal evidence from witnesses for both parties concerning the presence of odors in the vicinity of the plaintiffs' residence was varied and inconsistent. Two immediate neighbors of the plaintiffs testified to the episodic presence of noxious CT Page 1186 odors nearby their homes. Lyle Flaherty, who lives at 370 Rte 87, testified that he detects a slight acidic smell in the morning and that it is objectionable at least once a week. Judith Nemeth of 335 Rte 87 testified that she detects a sewer-like odor approximately three times a week, sometimes waking her up at night. She stated that the character of the odor has changed in the past few years. Members of the Pestey family gave varying characterizations of the odor and differing accounts regarding any changes in the character and intensity of the odor over time.
The defendants also produced as witnesses numerous neighbors, whose residences, in combination, nearly surrounded the defendants. A fair summary of their testimony is that these witnesses did not detect odors of burnt manure or odors they would characterize as akin to sewage, and that when they did detect odors they were most often normal farm odors. Some of the defense witnesses attributed odors to other potential odor sources in the community. Dr. Bruce Sherman, who is the Director of the Bureau of Regulations and Inspection of the Department of Agriculture, has been present on the defendants' farm on numerous occasions and has never detected odors different from normal farm odors.
No witness who testified to the presence of odors on or near the Pestey's home was able to state with reliable probability that odors emanated from the defendants' farm. Further, witness descriptions of the character of the odor were varying and inconsistent. This finding is significant because the defendants' dairy operation is not the only potential cause of odor in North Franklin. Dr. Joseph Sudik, former first selectman of Franklin, testified that during his tenure from 1992 to 1995 there were odor issues in the town relating to four different potential odor sources: a solid waste disposal facility, a mushroom production facility, a poultry farm, and the defendants' dairy farm. On two occasions, he visited the defendants' farm in connection with complaints from the plaintiff, James Pestey, and on neither occasion did he recall any noxious odors. The current first selectman, James Handfield, has also visited the defendants' farm on several occasions. He testified that he detected typical farm odors, but nothing offensive.
In addition to these four potential sources of odor, it is evident from trial testimony that within a four mile radius of the defendants' farm there are numerous potential odor-causing sources, including several other dairy farms, and two other, CT Page 1187 large, poultry facilities housing several hundred thousand chickens.
From 1990, when the defendants constructed the dairy barn, the State of Connecticut's Department of Agriculture and Environmental Protection have had significant contact with the defendants' operation. The defendants currently operate under an Agricultural Waste Management Plan approved by the Departments of Agriculture and Environmental Protection in 1995, which must be renewed in this calendar year. Water quality has been monitored by the Department of Environmental Production and remediation has taken place.[4]
Certainly, the plaintiffs have proven that the defendants operate a large dairy farm with more than six hundred milking cows housed in a free stall barn on acreage adjacent to their own property. There was sufficient evidence for the jury to decide that odors did emanate from the defendants' operation and constitute an unreasonable interference with the plaintiffs' use and enjoyment of their property. Unless a jury's determination is clearly erroneous or unsupported by the evidence the court should not interfere with its conclusions. Nevertheless, the court is not bound by the conclusions of the jury in exercising its own fact-finding responsibilities in regard to the second count. As a fact-finder, and given the absence of any direct evidence of any more than the incidental presence of routine farm odors actually present on the defendants' farm, the court is unwilling to infer that the odors claimed by the plaintiffs and their witnesses emanated from the defendants' farm and not from one or more of these other facilities, or that the odors periodically experienced on or about the Pestey's property adversely impacts air quality so as to warrant the court's intervention. The plaintiffs have failed to meet their burden of proof that the defendants' conduct is "reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, [or] water . . ." General Statutes § 22a-17.
Accordingly, judgment may enter for the defendants on the second count.
Bishop. J.