[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 STATEMENT OF APPEAL
In these consolidated cases, the plaintiffs, Eric Leshine, Erin O'Hare, Ann Sullivan and Edward Sullivan, appeal from the decision of the defendant, the Guilford Planning and Zoning Commission, approving the special permit waiver request of the defendants, Samuel D. Bartlett, Diana A. Bartlett, and the Bartlett Land Corporation[1] (Docket No. 413985), and from the subsequent approval of the Bartletts' special permit application (Docket No. 414600).[2]
 BACKGROUND
By application dated April 10, 1998, the Bartletts applied to the Guilford planning and zoning commission for a special permit to allow a four guest-room bed and breakfast facility to be located in a detached single-family dwelling. (Return of Record [ROR], Item 001, Attachment.) The zoning regulations require an applicant to submit a detailed, or professionally prepared, site plan with an application, and, as part of the special permit application, the Bartletts requested a waiver of this CT Page 5839 requirement. (ROR, Item 001, Attachment.)
The commission voted to approve the waiver request on May 20, 1998; (ROR, Item 051); and it approved the special permit application, with conditions, on June 3, 1998. (ROR, Item 052.) Leshine, O'Hare, and the Sullivans now appeal from the approval of the waiver request (waiver request appeal), and from the approval of the special permit application (special permit appeal).
 JURISDICTION
General Statutes § 8-8 governs appeals taken from a planning and zoning commission to the Superior Court. A statutory right of appeal may be taken advantage of only by strictly complying with the statutory provisions that create the right. See Bridgeport Bowl-O-Rama v. ZoningBoard of Appeals, 195 Conn. 276, 283, 487 A.2d 559 (1985).
Aggrievement
"[P]leading and proof of aggrievement are prerequisites to the trial court's jurisdiction over the subject matter of [the plaintiffs'] appeal." (Emphasis added.) Jolly, Inc. v. Zoning Board of Appeals,237 Conn. 184, 192, 676 A.2d 831 (1996). The plaintiffs allege that they are owners of real properties that abut, or are within one hundred feet of, a portion of the subject property. (Waiver Request Appeal, ¶ 15; Special Permit Appeal, ¶ 17.) They further allege that they have standing to appeal, pursuant to General Statutes § 22a-19, by virtue of their intervention in the commission's proceedings. (Waiver Request Appeal, ¶ 17; Special Permit Appeal, ¶ 19.)
The record contains warranty deeds evincing Leshine's and O'Hare's ownership of property which is "bounded" by property "now or formerly of The Bartlett Land Corp. . . ." (Plaintiffs' Exhibit 2.) The record further contains a warranty deed evincing the Sullivans' ownership of property similarly "bounded" by property "now or formerly of E.D. Bartlett. . . ." (Plaintiffs' Exhibit 2.)
Accordingly, the court finds that the plaintiffs are statutorily aggrieved pursuant to General Statutes § 8-8 (a)(1).
Timeliness and Service of Process
An appeal shall be commenced by service of process, within fifteen days from the date that the commission's notice of decision is published. See General Statutes § 8-8 (b). Further, it shall be commenced by leaving the process with, or at the abode of, the clerk or CT Page 5840 chairman of the commission, and with the clerk of the municipality. See General Statutes § 8-8 (e).
The record includes notices of the commission's decisions approving both the waiver request and the special permit. The notice of the waiver request approval states that the legal ad is "[t]o be published in the Shore Line Times on Wednesday, May 27th, 1998." (ROR, Item 051.) The waiver request appeal was commenced by service of process upon the commission's chairperson, the town clerk, and the Bartletts on June 10, 1998. Accordingly, the waiver request appeal was commenced in a timely fashion by service of process on the proper parties.
Similarly, the notice of decision of the special permit approval indicates that the legal ad was to be published "in the Shore Line Times on Wednesday, June 10th, 1998." (ROR, Item 052.) The special permit appeal was commenced by service of process upon the commission's chairperson, the town clerk, and on the Bartletts on June 24, 1998. The special permit appeal was commenced in a timely manner by service upon the appropriate parties.
 SCOPE OF REVIEW
In ruling upon a special permit application "a planning and zoning board acts in an administrative capacity. . . . Generally, it is the function of a zoning board or commission to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. The . . . trial court . . . decides whether the board correctly interpreted the section [of the regulations] and applied it with reasonable discretion to the facts. . . ." (Brackets in original; citations omitted; internal quotation marks omitted.) Irwin v. Planning Zoning Commission,244 Conn. 619, 627-28, 711 A.2d 675 (1998).
"In applying the law to the facts of a particular case, the board is endowed with a liberal discretion and its action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal." (Internal quotation marks omitted.) Id., 628. When "the zoning commission does state the reasons for its action, the question for the court to pass on is simply whether the reasons assigned are reasonably supported by the record and whether they are pertinent to the considerations which the commission is required to apply under the zoning regulations." Id., 629. Concerning factual questions "a reviewing court cannot substitute its judgment for that of the agency. . . . If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its CT Page 5841 judgment as to the weight of the evidence for that of the commission. . . . The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Citations omitted; internal quotation marks omitted.) Id.
With respect to the present appeals, the record provides that "in accordance with § 271-99 A. (2) the Guilford Planning and Zoning Commission waive[s] the requirement that a professionally prepared site plan and architectural plan be submitted and accepts the conceptual plans submitted by the applicant. This waiver is granted based upon a determination that no significant site work or architectural work is proposed." (ROR, Item 036.)
The record further reveals that the special permit was approved "based upon a finding that it conforms with § 273-94 of the Zoning Code of the Town." (ROR, Item 037.)
A. Whether the Prehearing Notice of the May 20, 1998 Public Hearing was Adequate
Although not raised as a ground on the face of the appeal, the plaintiffs argue in their memorandum that the prehearing notice of the May 20, 1998 public hearing was inadequate and misleading because, although the special permit at issue affected three lots, the notice provided the street number for only one of the lots. The defendants respond that the notice was sufficient because it contained assessor's map references for each of the relevant parcels, it provided the street address for the lot where the use was proposed, and it indicated that the plans were on file with both the town clerk and the planning and zoning office.[3]
The legal notice provides "Samuel Bartlett and Bartlett Land Corporation, 564 Great Hill Road, Map 113, Lot 2-1 and 16, Map 117, Lot 2, Zone R-8. Special Permit, Bed Breakfast, request to waive professionally prepared site plan. . . . Copies of the above applications are on file in the offices of the Town Clerk and Planning and Zoning Commission . . . for inspection." (ROR, Item 050.) The record reflects that 564 Great Hill Road is the site of the proposed bed and breakfast. (ROR, Item 001.) The record further reveals that Assessor's Map 117, Lot 2 is owned by the Bartlett Land Corporation, which is adjacent to Lot 1, and is subject to a right of way and a driveway easement in favor of Lot 1. (ROR, Item 001, Attachment.) In addition, Assessor's Map 113, Lot 16, also owned by the Bartlett Land Corporation, is located across the street from Lot 1, and is subject to a sewage disposal system easement in favor of Lot 1. (ROR, Item 001, Attachment.) CT Page 5842
"Zoning commissions are [statutorily] required to provide adequate published notice of a public hearing to be held on an application or request for a special permit or special exception." Nazarko v. ZoningCommission, 50 Conn. App. 517, 519, 717 A.2d 853, cert. denied,247 Conn. 940, 723 A.2d 318 (1998). "[T]his court has held that the purpose behind the notice requirement of § 8-3 is fairly and sufficiently to apprise those who may be affected by the proposed action of the nature and character of the proposed action so as to enable them to prepare intelligently for the hearing." (Internal quotation marks omitted.) Id. "There is no requirement that the published notice describe the proposed action in detail or with exactitude." Id.
In Nazarko v. Zoning Commission, supra, an application for a special exception was filed, seeking, in part, to improve an access driveway that traversed two parcels. "The published notice, [however], failed to describe the subject property by metes and bounds, by specific address or by reference to the nearest street." Id., 520. The Appellate Court concluded that the published notice was inadequate because, although it referenced one parcel by its lot number on the assessor's map, it failed to reference the second parcel, although the access driveway traversed both parcels. Id., 520. Similarly, in Peters v. Environmental ProtectionBoard, 25 Conn. App. 164, 168-69, 593 A.2d 975 (1991), the court concluded that a published notice was inadequate because it omitted the specific location of the proposed project, and referred to the subject property by street name only. In R.B. Kent Son, Inc. v. PlanningCommission, 21 Conn. App. 370, 378, 573 A.2d 760 (1990), however, the court found that a prehearing notice was adequate where it described the subject property by its location at the southern end of two other roads, and because it indicated that the relevant application materials were on file in the planning office. See id., 378. The court emphasized that "the notice may not be misleading, it need not be exact . . . and a public filing of the plan is relevant to the determination of the adequacy of the notice." (Citation omitted.) Id.
Unlike the notices at issue in Nazarko v. Zoning Commission, supra, and Peters v. Environmental Protection Board, supra, the notice in this case refers to the street address and assessor's map number for the site of the proposed bed and breakfast, as well as lot numbers and assessor's map references for the two additional parcels owned by the applicants. (ROR, Item 050.) In addition, similar to the notice in R.B. Kent Son,Inc. v. Planning Commission, supra, the notice provides the location of the filed application, and indicates that the application is available for inspection.
Accordingly, the court finds the prehearing notice is adequate, and the appeal will not be sustained on this ground. CT Page 5843
B. Whether the Commission Was Without Subject Matter Jurisdiction to Entertain the Special Permit Application Because Bartlett Failed to File an Application With Guilford's Inland Wetlands Commission
Invoking General Statutes §§ 8-3c (a) and 8-3c (b), the plaintiffs also claim that because the Bartletts failed to file an application with Guilford's inland wetlands commission, the zoning commission lacked subject matter jurisdiction to act on the application. The plaintiffs argue that the sewage disposal system servicing the site of the proposed bed and breakfast is located within a regulated area, and "[a]t issue from a wetlands perspective is not only the proposed new special permit use's impact on the existing system, but whether there is adequate reserve area if the system fails due to the additional burden of a commercial four unit bed and breakfast use." (Plaintiffs' Brief, p. 18.) The plaintiffs further maintain that they raised these issues by way of a verified pleading filed with the commission pursuant to General Statutes § 22a-19. They contend that they presented "substantial evidence" establishing a prima facie case as to these issues, and thereby shifted the burden to the Bartletts. The plaintiffs argue that the Bartletts failed to rebut their § 22a-19 claims, and that the commission failed to make any findings or conclusions concerning such claims.
The defendants counter that the application did not propose any regulated activity, and even if the septic system was within a regulated area, it would be exempt from regulation under an exclusion existent in the Guilford regulations that was in effect at the time the present septic system was installed. The defendants further argue that the plaintiffs presented no evidence with respect to their § 22a-19
claims.
General Statutes § 8-3c (a) provides, in part, that if a special permit application "involves an activity regulated pursuant to sections22a-36 to 22a-45, inclusive, the applicant shall submit an application to the agency responsible for administration of the inland wetlands regulations no later than the day the application is filed for a special permit or special exception." General Statutes § 8-3c (b) further provides that "[t]he commission shall not render a decision on the application until the inland wetlands agency has submitted a report with its final decision to such commission. In making its decision the zoning commission shall give due consideration to the report of the inland wetlands agency." A "regulated activity," as defined by General Statutes § 22a-38 (13), is "any operation within or use of a wetland or watercourse involving removal or deposition of material, or any obstruction, construction, alteration or pollution, of such wetlands or CT Page 5844 watercourses, but shall not include the specified activities in section22a-40. . . ."
Guilford's inland wetlands regulations define "regulated activity" as "any operation within, or use of, a wetland or watercourse system, or within fifty (50) feet of a wetland or watercourse system, involving removal or deposition of material or construction or alteration within such wetland or watercourse system, or involving obstruction or pollution of such wetland or watercourse system. . . ." (ROR, Item 031, Exh. D, Reg. § 2.1(r).) The regulations further define "regulated area" as "any inland wetland or watercourse as defined in these Regulations and the area within fifty (50) feet of such wetland or watercourse system and the area within one hundred (100) feet of major wetlands and watercourses as listed in Appendix A. The renovation, relocation, or repair or any subsurface waste disposal system within fifty (50) feet of a wetland or watercourse system in existence as of 22 April 1985 is exempt." (ROR, Item 031, Exh. D, Reg. § 2.1(s).)
The record reflects that an environmental analyst from the Regional Water Authority reviewed the application and determined that "[t]he property is within the watershed of Lake Menunketuc, which is diverted to Lake Gaillard, a public drinking water supply reservoir." (ROR, Item 024.) The analyst advised that "[t]he septic system should be examined to determine if it is adequately sized for this activity. In addition, it should be maintained and inspected regularly to ensure it functions properly." (ROR, Item 024.) The record further reveals that the town engineer reviewed the application and determined that "the septic system for the residence is located in an open field across the street for which an Easement has been granted for maintenance and operations. In the absence of an increase in the number of bedrooms in the house and any history of system problems, it was advised on 3/18/98 that there was no objections to the Special Permit." (ROR, Item 047.) The town engineer also indicated that the system had been inspected in response to a neighbor's concern regarding "a history of odor problems" that she believed were related to septic system failure. The inspection, however, evidenced "no indication of system failure. . . . Recent heavy rains would cause any marginal system to be distressed and could result in odor or discharge problems. The absence of any indications of odor or seepage indicates that the system is working well." (ROR, Item 047.) The engineer concluded that he had "no objections to the Special Permit." (ROR, Item 047.) The town engineer submitted a subsequent memorandum to the planning and zoning commission, reiterating that the bed and breakfast did not propose additional bedrooms to the existing house. (ROR, Item 048.) He explained that the sewage system review had considered that there was already a sewage flow associated with the home, Connecticut's health code dictated that the size of a septic CT Page 5845 system is predicated on the number of bedrooms, and that "an application for a Bed Breakfast is evaluated on the same basis." (ROR, Item 048, p. 1.) He observed that "[i]t was judged back in March that even though we didn't have an exact plan of what existed, there certainly was more than adequate area available to construct a new septic system if future problems should arise." (ROR, Item 048, p. 1.) The engineer further reiterated that a "claim that the system was failing was investigated and found to be inaccurate. There was no evidence of system failure on 3/31/98 and there is no history of any complaints of failure." (ROR, Item 048, p. 1.) He concluded that the existing system appeared to be working well, and there was no need to dig it up at this time "just to document its size and jeopardize harming operations if the existing residence is to remain with the same number of bedrooms." (ROR, Item 048, p. 1.) He recommended that the commission approve the bed and breakfast "with the stipulation that inspection of the area of the existing septic system be conducted on a quarterly basis by the Guilford Engineering Department to assure safety of operations." (ROR, Item 048, p. 2.) The record demonstrates that the commission did condition its approval of the application, in pertinent part, on the performance of a quarterly inspection of the existing septic system by the town's engineering department. (ROR, Item 037.)
During the May 20, 1998 public hearing, the plaintiffs' attorney raised an issue "with regard to the septic system, directly down gradient [from] the septic system you have a water body. You have wetlands." (ROR, Item 053, p. 44.) He then referred to a series of photographs taken of the subject property from the property of one of his clients, purporting to show "down gradient of the hill there's a water body, there's a pond. That all feeds into a fairly significant wetlands system that I believe goes in to . . . as part of this water shed as we'll see in a moment . . . that feeds into Lake Gallard which is indeed . . . a public water supplier. And in between the road, in that water body, is where the septic system presently exists. . . ." (ROR, Item 053, p. 45.)
The record does not indicate that a "regulated activity" was involved with respect to the subject application. The application, itself, does not propose an operation involving material removal or deposition, or any wetlands or watercourses obstruction, construction, alteration or pollution. Even if a "regulated activity" were proposed, the record is devoid of evidence establishing that such activity would occur within a "regulated area." The plaintiffs' attorney referenced certain photographic exhibits during the public hearing, one of which depicts a body of water; (ROR, Item 034); however, it is impossible to ascertain the distance between the pond and the septic system from this photograph. In addition, if a "regulated activity" involving the septic CT Page 5846 system were required, the defendant commission correctly observes that such activity would be exempt under the Guilford regulations. Regulation § 2.1(s), which defines "regulated area," expressly exempts the "renovation, relocation, or repair of any subsurface waste disposal system within fifty (50) feet of a wetland or watercourse system in existence as of 22 April 1985. . . ." (ROR, Item 031, Exh. D, Reg. § 2.1(s).) The record reflects that this septic system was in existence as of 1981. (ROR, Items 047; 048; 053, p. 18.)
The plaintiffs shoulder the burden of proof in demonstrating that the commission acted improperly. Spero v. Zoning Board of Appeals,217 Conn. 435, 440, 586 A.2d 590 (1991). The commission's conclusions "must be upheld by the trial court if they are reasonably supported by the record." (Internal quotation marks omitted.) DeBeradinis v. ZoningCommission, 228 Conn. 187, 198, 635 A.2d 1220 (1994). "The question is not whether the trial court could have reached the same conclusion, but whether the record before the agency supports the decision reached." (Internal quotation marks omitted.) Id. Here, the commission entertained the special permit application in the absence of a report from the inland wetlands commission. The court finds that the record evidence supports the commission's action, and the court will not sustain the appeal on this ground.
The plaintiffs further argue that they raised these same issues by way of a verified pleading filed with the commission pursuant to General Statutes § 22a-19. The plaintiffs conclude that they "presented substantial evidence establishing a prima facie case as to these issues, thereby shifting the burden to defendant Bartlett." (Plaintiffs' Brief, p. 18.) The plaintiffs contend that the Bartletts failed to rebut their § 22a-19 claims, and that the commission failed to make the required findings or conclusions as required by law.
The plaintiffs' verified pleadings specifically allege that "though it is unclear from the present application because of the lack of information, any discharge to an on-site or off-site septic system may result in conduct which unreasonably pollutes, impairs, or destroys the public trust in the air, water or other natural resource of the State of Connecticut." (ROR, Items 045; 046.)
In explaining the burden of proof under the Environmental Protection Act, the Connecticut Supreme Court has stated that "[a]lthough the ultimate burden of proof never shifts from the plaintiff, the EPA contemplates a shifting of the burden of production . . . . The plaintiff must first make a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair, or destroy the public CT Page 5847 trust in the air, water or other natural resources of the state. . . ." (Citations omitted; internal quotation marks omitted.) ManchesterEnvironmental Coalition v. Stockton, 184 Conn. 51, 57-58, 441 A.2d 68
(1981). The court further explained that "[o]nce a prima facie case is shown, the burden of production shifts to the defendant." Id., 60. When reviewing such a case, a trial court must "apply the statutory burden-shifting test. . . ." Id., 60-61.
As discussed above, the only expert evidence in the record concerning the septic system was generated by the town engineer, who observed that the application did not propose an increase in bedrooms, and that the size of a septic system is governed by the number of existing bedrooms. (ROR, Items 047; 048.) He further emphasized that, upon inspection, the system demonstrated no signs of failure, he concluded that it appeared to be working well, and he recommended that the engineering department should conduct quarterly inspections if the commission approved the application. (ROR, Items 047; 048.) Prior to voting on the application, the record demonstrates that the commission considered the engineer's report, and, when voting on the application, it incorporated the engineer's quarterly inspection recommendation as a condition of approval. (ROR, Item 040, pp. 11-13.)
Conversely, at the public hearing, the only evidence produced by the plaintiffs with respect to the pollution issue was the previously mentioned letter from the water authority, which recommended an examination of the system to ascertain its adequacy; (ROR, Item 053, pp. 46-47); and which further recommended that the system be regularly maintained and inspected. (ROR, Item 053, p. 47). They also referred to a permit indicating that a septic system repair application had been submitted in 1975. (ROR, Item 053, p. 47). The town engineer addressed the adequacy and inspection issues in his memoranda. The court finds that the plaintiffs have failed to produce evidence to buttress their claims of possible pollution emanating from the applicants' septic system, and, therefore, have failed to make a "prima facie showing" that the commission's conduct "is reasonably likely to pollute, impair, or destroy the public trust in the air, water or other natural resources" of Connecticut.
The court will not sustain the appeal on this basis.
C. Whether Commissioner Elizabeth Bartlett's Appearance at the May 20, 1998 Public Hearing Constituted a Violation of General Statutes § 8-11
The plaintiffs also appeal on the ground that the appearance of Elizabeth Bartlett at the May 20, 1998 public hearing constitutes a conflict of interest. Elizabeth Bartlett is a member of the commission, CT Page 5848 a relative of Samuel D. Bartlett, an officer of the Bartlett Land Corporation and a co-signer of the subject application. The plaintiffs claim that, although she recused herself from the vote on both the waiver request and the special permit application, she impermissibly appeared before the commission at the public hearing, speaking favorably as to the application. The plaintiffs argue that General Statutes § 8-11
prohibits a commission member from appearing on behalf of a person or corporation in any pending matter before a commission.
The defendants respond that Elizabeth Bartlett, who owns property adjacent to one of the parcels owned by the Bartlett Land Corporation referenced in the application, did not speak at the hearing in a representative capacity, but merely spoke on her own behalf.
The record reveals that Samuel D. Bartlett and the Bartlett Land Corporation are listed as applicants on the special permit application. (ROR, Item 001.) In addition, a letter, signed by Elizabeth C. Bartlett in her capacity as the vice president of the Bartlett Land Corporation, is attached to the application. (ROR, Item 001, Attachment.) The letter states that the Bartlett Land Corporation owns land adjacent to the subject lot, which is subject to a right of way and a driveway easement in favor of the subject lot. (ROR, Item 001, Attachment.) In addition, the corporation also owns land across the street from the subject lot which is subject to a sewage disposal system easement in favor of the subject lot. (ROR, Item 001, Attachment.) The letter provides that "[t]he Bartlett Land Corporation is joining Samuel D. Bartlett, individually, as a co-applicant for this special permit for the sole purpose of indicating its support of, and consent to, said application." (ROR, Item 001, Attachment.) The letter further provides that "[t]he officers and directors of the Corporation do not believe that the proposed bed-and-breakfast facility, or any incremental increase in the use of the driveway or septic system resulting therefrom, will result in any expansion of either easement." (ROR, Item 001, Attachment.)
The record also reveals that during the April 15, 1998 commission meeting, at which the commission unanimously voted to receive the special permit application and set a public hearing date, Elizabeth Bartlett had "excused herself from this application." (ROR, Item 038, p. 9.) Similarly the minutes of the May 20, 1998 public hearing reflect that Elizabeth Bartlett "excused herself from [the special permit] application, she then left her seat at the commission table and sat in another area of the meeting room." (ROR, Item 039, p. 2.) During the May 20, 1998 public hearing, however, Elizabeth Bartlett addressed the commission as follows: "I'm Elizabeth Bartlett, I have no objection to the Special Permit. I reside in the house adjacent on the north. There will be little increase in the existing traffic, and I see no impact on CT Page 5849 the immediate neighborhood." (ROR, Item 053, p. 26.)
The commission voted upon the special permit application at a June 3, 1998 meeting. The minutes indicate that "Commissioner Bartlett excused herself from voting on this application, left her seat at the Commission table and sat in another area of the meeting room." (ROR, Item 040, p. 11.) The minutes reflect that a discussion of the application ensued, with the commissioners voting unanimously to approve the application with various conditions. (ROR, Item 040, pp. 12-13.)
General Statutes § 8-11 provides, in pertinent part, that "[n]o member of any zoning commission . . . shall appear for or represent any person, firm, corporation or other entity in any matter pending before the planning or zoning commission. . . . No member of any zoning commission . . . shall participate in the hearing or decision of the board or commission of which he is a member upon any matter in which he is directly or indirectly interested in a personal or financial sense."
"An interesting aspect of the phrasing of [section] 8-11 . . . is that it bars a member of the agency from (1) participating as an agency member in the hearing or decision where he or she has a conflict of interest on the matter before the agency, and (2) from representing anyone else before the agency, but it does not expressly prevent agency members from representing themselves in applications before the agency. While this might be claimed to be an oversight, another argument is that agency members should not have less property rights than other property owners in the municipality, and should not have to resign from the agency in order to present an application involving their own land." R. Puller, 9A Connecticut Practice Series: Land Use Law and Practice (1999) § 47.3 p. 441. In this appeal, Elizabeth Bartlett is not the owner of the subject parcel. She is an adjacent landowner, and, as previously noted, she signed the application in her capacity as the duly authorized vice president of the Bartlett Land Corporation, the co-applicant.
In conflict of interest cases, Connecticut courts have found a violation of General Statutes § 8-11 when a commission or board member not only appears before a commission or board on a particular matter, but also participates in the decision-making process with respect to that matter.
In Daly v. Town Plan Zoning Commission, 150 Conn. 495, 191 A.2d 250
(1963), for example, a member of the local town plan and zoning commission, was also the president of an association which had contracted to sell property to a company, conditioned upon the company's ability to erect a radio tower on the premises. The erection of a radio tower on this property required a variance, and the commissioner CT Page 5850 appeared before the zoning board of appeals in support of the company's variance application. The board, however, denied the application. Subsequently, the town plan and zoning commission voted to amend the regulations to allow the erection of radio towers in residential districts, and the commissioner participated in this hearing, voting toamend the regulations. The court observed that although it did not impute any "improper influence" to the commissioner, "[t]he evil lies not in influence improperly exercised but rather in the creation of a situation tending to weaken public confidence and to undermine the sense of security of individual rights which the property owner must feel assured will always exist in the exercise of zoning power." Id., 500. The court emphasized that "the action of the commission, taken under the circumstances disclosed, leaves [the commissioner's] part in it open to misinterpretation or question by interested property owners." Id., 498-99.
In Ferguson v. Zoning Board of Appeals, 29 Conn. Sup. 31, 269 A.2d 857
(1970), applicants applied to the planning and zoning commission for a zoning permit, the permit was issued, but, due to a complaint of a violation by the applicants' abutting neighbors, the chairman of the commission revoked the permit. The applicants applied to the zoning board of appeals for a variance, but the chairman of the commission appeared and spoke in opposition to the variance. The chairman conceded that the abutting neighbors had contacted him on a number of occasions concerning their objections, and the father of one of the neighbors had been a member of the commission, had served with the chairman, and had personally contacted the chairman concerning the matter. The court determined that the chairman's "strong personal interest in the [applicant's neighbors], in addition to his participation in theofficial action of his own commission, was a substantial factor in causing his appearance as a witness, in opposition to [the applicants], before the board. In a real and legal sense, this constituted an `appearance' or `representation' within the prohibition of § 8-11." (Emphasis added.) Id., 39.
In a more recent Superior Court case, Hendel Family Trust v. OldSaybrook Zoning Board of Appeals, Superior Court, judicial district of Middlesex at Middletown, Docket No. 66564 (March 15, 1994, O'Keefe, J.), the court held that a zoning commissioner's "official status on the zoning commission, and his participation in its decision regardingplaintiff's application combined with his association with the plaintiff's opponents made his appearance before the board a violation of [§] 8-11." (Emphasis added.) Id. In that case, the plaintiff/applicant sought a variance for work to be performed at its gas station. The zoning commissioner had previously voted against the granting of a variance for the applicant, had discussed aspects of the CT Page 5851 application with two of the applicant's competitors, sat with the competitors during the zoning board of appeals variance hearing, and had voiced his opposition to the application before the board.
In cases where a commissioner has not participated in the actual consideration of, or vote upon, an application, courts may still find a statutory violation in certain circumstances.
In R.K. Development Corp. v. Norwalk, 156 Conn. 369, 242 A.2d 781
(1968), an applicant sought approval for a planned residential development, which was approved by the planning commission, but disapproved by the municipal common council. One of the councilmen, had "appeared before the planning commission on behalf of his wife and otherconstituents in the area in opposition to the [applicant's] plan." (Emphasis added.) Id., 373. Although the councilman had attended the common council meeting at which it voted to disapprove the application, he did not take part in the vote or discuss the application with other council members. The court found that the councilman's actions violated the relevant statute, General Statutes § 8-21 (the planning commission analogue to § 8-11), because the planning commission was "an arm of the council" and the councilman had "put himself on record at the hearing before the planning commission with full knowledge that his stated opposition would later be transmitted by the commission to the council." Id., 374.
The statute, however, does not preclude commissioners from appearing before a land use commission on their own behalf with respect to an application. See Massimo v. Planning Commission, 41 Conn. Sup, 196,564 A.2d 1075 (1989). See also, R.C. Associates v. Zoning Board ofAppeals, Superior Court, judicial district of Hartford-New Britain at Enfield, Docket No. 339303 (August 19, 1991, Doyle, J.).
In Massimo v. Planning Commission, supra, the court determined that an alternate member of a zoning commission, who lived across the street from the applicant's property, was appearing for himself, and, therefore, did not violate General Statutes § 8-11 by attending a public hearing and speaking in opposition to an application before another commission. See id., 199. The court characterized the issue as "whether any member, regular or alternate, is barred from speaking at a hearing where one acts in one's individual interest as a property owner, rather than as an advocate for others." Id. The court emphasized that "[s]ection 8-11 aims its prohibition at zoning members or alternates who act on behalf of, or, as a spokesperson for, third parties . . . [i]t is that advocacy for others that the statute prohibits. It does not prohibit a member or alternate of a zoning commission from speaking individually before a planning commission about the effect of an CT Page 5852 application on his own property." Id., "[W]hen the legislature used the phrase `appear for or represent,' its purpose was to prevent the member from acting for or on behalf of others, and not from speaking for himself on an application affecting his own property. If it intended to prevent any zoning board member individually from either making an application or speaking against an application the legislature could have accomplished that end without using the phrase `appear for or represent any person.'" Id., 200.
In this appeal, the record does not demonstrate that commissioner Bartlett endorsed the application, then improperly deliberated or voted on the application. Nor does the record indicate that she appeared before the commission in any capacity other than in her individual capacity — as a neighboring landowner. Rather, the record reveals that she prefaced her remarks by introducing herself as an adjacent resident, she voiced her lack of objection, and continued with her personal opinion that "[t]here will be little increase in the existing traffic, and I see no impact on the immediate neighborhood." (ROR, Item 053, p. 26).[4]
The plaintiffs have the burden of demonstrating that the board acted illegally, arbitrarily or in abuse of its discretion in granting the special permit application. The plaintiffs, however, have not demonstrated that commissioner Bartlett was acting as a spokesperson for anyone other than herself, in her capacity as an adjacent landowner. The record reflects that various individuals voiced their support of the bed and breakfast, the record contains numerous letters in support of the application, and the record reveals that the commission reviewed numerous exhibits with respect to the subject property. See Zeigler v.Thomaston, 43 Conn. Sup. 373, 382, 654 A.2d 392 (1994), aff'd,232 Conn. 270, 64 A.2d 270 (1995) (admission of letter from spouse of disqualified member would constitute harmless error when viewed against backdrop of other testimony and documents.)
Further, there is no indication in the record that the plaintiffs raised any objection to Bartlett's testimony at the time of the hearing. "[M]odern procedural concepts regard with disfavor the failure, whether because of a mistake of law, inattention or design, to object to errors occurring in the course of a trial until it is too late for them to be corrected, and thereafter, if the outcome of the trial proves unsatisfactory, the assignment of such errors as grounds of appeal." (Internal quotation marks omitted.) Lurie v. Planning ZoningCommission, 160 Conn. 295, 311, 278 A.2d 799 (1971).
Accordingly, the court finds that the plaintiffs' appeal will not be sustained on the ground that Elizabeth Bartlett violated General CT Page 5853 Statutes § 8-11.
D. Whether the Application Fails to Comply with Guilford Zoning Regulations § 273-94(C)(1)(c)
The plaintiffs next appeal on the ground that the application failed to satisfy the twenty percent maximum increase in total floor area requirement found in § 273-94(C)(1)(c) of Guilford's Zoning Regulations. (Plaintiffs' Brief, p. 23.) Section 273-94(C)(1) provides that "[i]n order to be approved by the Commission, bed-and-breakfast facilities must meet the following standards: . . . (c) [a]dditions to the structure to accommodate the bed-and-breakfast activity shall be limited to not more than 20% of the total floor area of the dwelling." (ROR, Item 031, Exh. A.) Referring to several building permits that the Bartletts sought prior to submitting the subject special permit application, the plaintiffs contend that the additional authorized floor area resulted in a twenty-three percent increase in total floor area. The plaintiffs maintain that these "building permits were secured to accommodate the proposed commercial four unit bed and breakfast use." (Plaintiffs' Brief, p. 24.)
The defendants counter that the Bartletts made certain improvements to their residence within a two-year period prior to submitting the subject application. (Defendants' Brief, p. 22.)[5] The defendants contend that the improvements existed before the special permit was either filed or approved, and there is no record evidence that the improvements were designed to "accommodate the bed-and-breakfast activity," as opposed to improvements made relative to the occupancy of the residence.
The record contains various building permits, including: Permit No. 97-3068, issued 3/14/97 (406 square foot screened porch); Permit No. 97-3524, issued 7/22/97 (relocation of first floor bath and laundry, and expansion of second floor office.) (ROR, Item 031, Exh. E.) The record does not demonstrate, however, that these improvements were designed to "accommodate the bed-and-breakfast activity." Rather, the record reflects that the town planner, George Kral, informed the commission that "the regulations state the building cannot be expanded more than 20% for the proposed use of a Bed Breakfast," and he further explained that "additions were made to this building for residential purposes prior to making this application." (ROR, Item 040, p. 11.)
It is the commission's function "to decide within prescribed limits and consistent with the exercise of [the commission's] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply." (Emphasis added.) Irwin v. Planning and Zoning Commission, supra, 244 Conn. 627. CT Page 5854 (1998). It is submitted that, based upon the representations of the town planner, the commission reasonably could have found that the earlier improvements were not designed to accommodate the proposed bed and breakfast activity, and that the application conformed to the 20% total floor area limitation contained in § 273-94(C)(1)(c) of the zoning regulations. The court will not sustain the appeal on this ground.
E. Whether the Application Fails to Comply with Guilford Zoning Regulations § 273-94(C)(2)(c)
The plaintiffs further appeal on the ground that the applicants failed to upgrade the existing sewage disposal system to accommodate the proposed commercial four-unit bed and breakfast. (Plaintiffs' Brief, p. 25.) Regulation § 273-94(C)(2) provides that "[i]n reviewing an application for a bed-and-breakfast special permit, the Commission shall also consider the following issues and criteria: . . . (c) [t]he adequacy of the sewage disposal system to accommodate the proposed use. The Commission may require that a report which has been prepared by a licensed engineer be submitted." (ROR, Item 031, Exh. A.) The plaintiffs argue that aside from the town engineer's letter, the record contains no evidence concerning the location or adequacy of the existing system.
The defendants respond that the commission refused to vote on the application at the close of the May 20, 1998 public hearing because it wanted to obtain additional information from the town engineer with respect to the septic system. The engineering department found that the existing system was adequate for the proposed bed and breakfast use, the plaintiffs submitted no evidence to rebut the engineer's findings, and, the commission justifiably voted to approve the application after imposing a condition that the engineering department undertake quarterly inspections of the system.
The record provides that, at the conclusion of the May 20, 1998 commission meeting, commissioner Barry suggested the commission continue deliberations until more information was obtained, and the commission unanimously voted to continue deliberation on the application. (ROR, Item 039, p. 9.) As discussed previously, the memoranda from the town engineer related that the system was located in an open field across the street, an inspection of the property uncovered no evidence of system failure, and there was an absence of odor or seepage. (ROR, Item 047.) The engineer further found that the existing system was working well and it was unnecessary to dig it up. In addition, he reported that "there was certainly was more than adequate area available to construct a new septic system if future problems should arise"; (ROR, Item 048.); and the commission adopted his recommendation to impose a quarterly system CT Page 5855 inspection upon its approval of the application. Accordingly, it is submitted that the commission did comply with the regulations by considering the adequacy of the septic system.
The court will not sustain the appeal on the ground that the application violated § 273-94(C)(2)(c) of Guilford's zoning regulations.
F. Whether the Application Exceeded the Lot Coverage Requirements of the Guilford Zoning Regulations
The plaintiffs also claim that the application exceeded the 5% maximum aggregate lot coverage provided in § 273-24, Table 3 (11) of the zoning regulations. The defendants respond that this lot is governed by § 273-25(B)(2) of the regulations, therefore, the maximum lot coverage is 10%.
During the May 20th public hearing, the town planner stated that "the lot was created pursuant to the section of the zoning regulations that . . . allows for [a] limited number of R-7 lots to be created in the R-8 zone. [T]hat would permit an eighty thousand square foot lot . . . this lot does meet those." (ROR, Item 053, p 88.) The minutes of the June 3, 1998 meeting further reflect that the town planner had observed that the zoning enforcement officer had reviewed the lot coverage issue, and had "concluded that the structures on the lot were within the allowed lot coverage for this zone." (ROR, Item 040, p. 11.)
Accordingly, based upon this record evidence, the court will not sustain the appeal on the ground that the application exceeds the allowable maximum lot coverage.
G. Whether the Application is Inconsistent with Guilford's ComprehensivePlan
The plaintiffs further appeal on the ground that the proposed bed and breakfast is inconsistent with Guilford's Comprehensive Plan. The defendants counter that the Comprehensive Plan is only an advisory document, the documents referred to by the plaintiffs are mere drafts, and, regardless, a bed and breakfast is not inconsistent with the draft Comprehensive Plan.
"[T]he comprehensive plan in accordance with which zoning regulations are to be adopted is such a plan as the zoning commission devises." (Internal quotation marks omitted.) Dooley v. Town Plan ZoningCommission, 154 Conn. 470, 473, 226 A.2d 509 (1967). "The comprehensive plan usually consists of the zoning regulations themselves and the CT Page 5856 zoning map which has been established pursuant to those regulations in the absence of a formally adopted comprehensive plan. The requirement of a comprehensive plan is generally satisfied when the zoning authority acts with the intention of promoting the best interests of the entire community." R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (1999) § 4.3, p. 52.
The document referred to by the plaintiffs was stamped "DRAFT." (ROR, Item 031, Exh. G.) The introduction section describes the purpose of the plan, and the process undertaken to develop the plan. This section also states that "[t]his draft plan was . . . (to be finished when the rest of the plan is written and we have had follow-on briefings, polls, public hearings, etc.)." The plaintiffs' reliance on this document is misplaced. To the extent this court is willing to lend weight to this "draft" document, however, it is submitted that the plan does not prohibit a bed and breakfast. The document contains a section entitled "North Guilford" (the location of the Bartletts' parcel), and, with respect to this area, the plan provides that "The primary goal of this plan is to protect and preserve these special places. . . . To protect and preserve does not necessarily mean to preserve exactly as they are,
but rather to preserve and enhance those special aspects of each place or area that give it its unique quality." (Emphasis added.) (ROR, Item 031, Exh. G, p. 9.) The plan further emphasizes the importance of Guilford's economic development. It provides that "Guilford's economic development planning is multi-faceted and a very important part of its overall planning program. The benefits of economic development are as diverse, as the wide variety of types of activity described herein as economic development. Clearly these types of activities make the Town a more desirable place to live." (ROR, Item 031, Exh. G, p. 12.) In addition, one of the stated policies in the plan is the development of small scale tourism. The plan states that "[t]he development of small scale lodging should be directed to the Westside area," but it does not define "small-scale lodging," nor does it prohibit "small-scale lodging" in areas other than the Westside. (ROR, Item 031, Exh. G., p. 12.)
For the reasons stated above, the court will not sustain the appeal on the ground that it is inconsistent with the Comprehensive Plan.
H. Whether the Bed and Breakfast Use is Incompatible with the Existent Retail Use and Sawmill Operation on the Property
The plaintiffs claim that the existing retail use and sawmill operation on the property are not compatible with a commercial four-unit bed and breakfast. They argue that the incompatibility of such uses violates the mandate of General Statutes § 8-2 to protect the public safety and health. General Statutes § 8-2 provides, in part, that CT Page 5857 regulations may provide that certain "structures or uses of land are permitted only after obtaining a special permit . . . from a zoning commission . . . subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values." The defendants reply that the commission complied with § 8-2 by imposing conditions upon its approval requiring quarterly septic system inspections, limiting the number of bedrooms, and restricting the meals served to include breakfast, only.
The record reflects that the subject parcel is a two-acre lot, and the surrounding property, owned by the Bartlett Land Corporation, consists of one hundred and ninety-two acres. (ROR, Item 053, p. 56.) In addition, the Bartletts operate a sawmill and engage in retail sales of Christmas trees. (ROR, Item 053, p. 89.) The record, however, is devoid of evidence demonstrating that the sawmill operation, retail Christmas tree sales, and a bed and breakfast would be incompatible, or negatively impact public health and safety.
The commission fulfilled the mandate of General Statutes § 8-2 by limiting the number of guest rooms, limiting the meals permitted to be served, and imposing conditions designed to monitor the adequacy of the septic system. The appeal will not be sustained on this ground.
I. Whether the Proposed Bed and Breakfast Will Adversely Impact the Values of the Abutting Properties in Violation of §§ 273-94(C) (2)(a) and 273-99(c) of Guilford's Zoning Regulations and General Statutes § 8-2
The plaintiffs next appeal on the ground that the proposed use will adversely affect their properties. The defendants counter that the record does not demonstrate that the bed and breakfast would decrease property values, but, even if it did impact such values, the regulations do not require the commission to deny an application on such a basis.
The commission must consider property values when reviewing an application for a special permit. See General Statutes § 8-2. See also Anastasi v. Zoning Commission, 163 Conn. 187, 190, 302 A.2d 258
(1972). In addition, § 273-94 of the regulations provides that the commission shall consider a number of factors when reviewing a bed and breakfast application. For example, subsection (C)(2)(a) provides that the commission shall consider "[t]he impact of the facility on the residential quality of the adjacent neighborhood and the opinions of those residing in said neighborhood." (ROR, Item 031, Exh. A.) Regulation § 273-99(C) further provides that "Conditions. All special permits may be granted subject to appropriate conditions and CT Page 5858 safeguards, including limitations on time for construction and commencement of use, necessary to conserve the public health, safety and general welfare and property values in the neighborhood." (ROR, Item 031, Exh. A.)
The record contains a letter from a certified general appraiser addressed to the plaintiff, Leshine, which states "[t]he existence of a commercial Bed Breakfast use upon the next adjacent improved parcel, would create increased traffic flow and resulting safety concerns along Great Hill Rd., and diminish the quiet enjoyment of your property due to curious, meandering strangers. The result would be a decrease in the private, rural appeal of your property, and therefore a diminution in its market value, in my opinion." (ROR, Item 031, Exh. K.) The record also contains a document, entitled "COMMENT ADDENDUM" from another certified appraiser, referencing the property of the plaintiffs, the Sullivans. The comment states that "[a]n appraisal is an estimate of value based on fact. Due to the following reasons it is impossible at this time to give an estimated value change of your property if the proposed use change of the neighboring property is granted." (Emphasis added.) (ROR, Item 031, Exh. K.) The comment continues with some generalized statements. For example, the appraiser posited that a change of use it a residential area "does [affect] value and appeal," and a bed and breakfast is a "commercial use," and that some have turned into "`small motels with restaurant[s].'" (ROR, Item 031, Exh. K.) He emphasized that he was "not saying this would [affect] all potential buyers of your property, but if it [affects] any, it [affects] your efforts to recover the maximum value of your property." He then listed areas of concern that could affect potential buyers, such as whether the bed and breakfast could expand, and was the site capable of handling the additional waste that would be generated by the guests. (ROR, Item 031, Exh. K.)
"[A]n administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." Huck v. Inland Wetlands Watercourses Agency,203 Conn. 525, 542, 525 A.2d 940 (1987). In this appeal, the record demonstrates that the evidence of the respective appraisers consisted of a series of general, conjectural statements, unsupported by any data.
Section § 273-94(C)(2)(a) of the regulations also requires the commission to consider the opinions of neighboring residents. The record reflects that the commission heard testimony from a number of area residents who spoke in favor of the application. (ROR, Item 053, pp. 20-26, 90; Item 039, p. 3.) The record also reveals that the commission heard from neighbors who voiced opposition to the project. (ROR, Item 053. pp. CT Page 585926-31, pp. 60-85.) Subsection (c)(2)(b) of the regulations further requires the commission to consider such criteria as "the significance of the proposed use in terms of the town's interest in encouraging tourism." (ROR, Item 031, Exh. A.) The record demonstrates that a member of the Chamber of Commerce spoke in support of the application, stating that having a bed and breakfast to accommodate visitors would help in preserving Guilford's village-like setting. (ROR, 053, pp. 24-25.)
The commission is responsible for weighing the evidence, and, based upon the record evidence, it did not abuse its discretion by not denying the application on the basis of a decrease in property values. Accordingly, the court will not sustain the appeal on this ground.
J. Whether the Commission Abused Its Discretion by Granting the Applicants' Request to Waive the Preparation and Submission of a Site Plan and Architectural Plan
The plaintiffs further claim that there are significant "gaps" in the subject applications, and that many of the issues raised on appeal could have been addressed if Bartlett had submitted a certified site plan. The defendants respond that the commission properly exercised its discretion in waiving the site plan requirement as the record established that no alterations were proposed for the property, there was no history of septic problems, and adequate land existed if the septic system ever required renovations. The defendants observe that the site plan that was
submitted was "prepared using an existing subdivision map, an A-2 survey that had been previously prepared for the property." (Defendants' Brief, p. 33.) The defendants also emphasize that the commission has waived the same site plan requirements for all other bed and breakfast applications.
Guilford Zoning Regulations § 273-99 governs special permit procedures. Subsection (A)(b) states that "[a] site plan, in accordance with § 273-97B(2) shall be included." (ROR, Item 031, Exh. A.) Subsection (A)(c) provides for the submission of architectural plans. (ROR, Item 031, Exh. A.) Subsection (A)(2) further provides, however, that "[t]he Commission may waive any item required under Subsection A(1)(b) or (c) if it finds such item unnecessary to its consideration of the application." (ROR, Item 031, Exh. A.) The record establishes that the commission granted the applicant's waiver request on May 20, 1998 "in accordance with § 271-99A(2) . . . This waiver is granted based upon a determination that no significant site work or architectural work is proposed." (ROR Item 036.)
The record supports the commission's approval of the waiver request. The application did not seek any exterior alterations; (ROR, Item 053, CT Page 5860 p. 6); and it contained a recorded survey map that had been marked up for the purpose of this application. (ROR, Item 053, p. 8-9.) A letter from the applicant's attorney, appended to the application, emphasized that the waiver request was being made "with the knowledge that the [commission] has heretofore not required professionally prepared site plans for any bed-and-breakfast facility approved prior to the present application." (ROR, Item 001, Attachment.) During the May 20th public hearing, the applicant's attorney again observed that the commission had waived the requirements for all previous bed and breakfasts applications (ROR, Item 053, p. 5.) Further, there was no history of septic system problems, and the town engineer had declared the system to be adequate for the proposed use. The commission did not abuse its discretion by waiving the site plan and architectural plan requirements.
 CONCLUSION
For the foregoing reasons, the plaintiffs' consolidated appeals are dismissed.
The court wishes to acknowledge the succinct effort of counsel in framing the issues.
 Robert P. Burns Judge Trial Referee